## STATE OF MARYLAND *v.* MARION THOMAS JONES

[No. 385, September Term, 1972.]

*Decided June 1, 1973.*

12

14

The cause was argued before MORTON, MOYLAN and MENCHINE, JJ.

*Emory A. Plitt, Jr., Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County*, and *E. Garrison Neal, Assistant State's Attorney for Prince George's County*, on the brief, for appellant.

*James Ignatius Keane*, with whom were *DePaul, Willoner & Kenkel* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

To dismiss, with prejudice, an indictment for armed robbery, because a defendant claims he was denied a speedy trial, is a severe sanction. It is the final denial of organized society's right to bring an accused transgressor before the bar of justice. In the face of vexing delays, lesser remedies may well commend themselves: the State may be put to the extraordinary burden of proceeding to trial on short or well-nigh immediate notice; a defendant's request for pretrial release, on bail or recognizance, may take on additional merit.[1] To say, however, that the people, because they have not yet successfully retooled an overtaxed and

---

1. The analysis of Professor Anthony G. Amsterdam, of Stanford University Law School, before the joint meeting of the Appellate Judges Conference and the National Conference of State Trial Judges in San Francisco, on August 12, 1972, is appropriate:

" . . . [T]here is not one speedy trial right, there are many speedy trial rights, and . . . in asking whether or not the right to a speedy trial has been denied, the old law professor's question 'For what purpose?' is all important.

. . . I think the test for when a trial is too long delayed for Sixth Amendment purposes is one thing where a defendant is asking for a trial. There it will be very brief indeed and he may have a right to a very quick trial. It may be shorter, if what he is asking for is release from confinement pending trial. It will be somewhat longer, where what he is asking for is the right to have the charges dismissed without prejudice and it might be quite long, indeed, before he is entitled to dismissal of the charges with prejudice."

obsolescent system to meet the demands of a computerized age, must forfeit forever the right to proceed against an accused felon, is an extreme and ultimate step to be taken only for the weightiest of reasons. The words of Justice Cardozo are pertinent, "Justice, though due to the accused, is due to the accuser also . . . We are to keep the balance true." [2]

In *State v. Lawless*, 13 Md. App. 220, 283 A. 2d 160, we analyzed at length the Sixth Amendment right to a speedy trial, distilling the teaching of twenty-five decisions of the Court of Appeals and fifty-eight decisions of this Court [3] upon the subject, as well as eight opinions of the Supreme Court which had, as of that time, treated the right. Since the promulgation of that opinion, the Supreme Court has twice addressed itself to the speedy trial issue: in *United States v. Marion*, 404 U. S. 307, 92 S. Ct. 455, 30 L.Ed.2d 468 (1971), and in *Barker v. Wingo*, 407 U. S. 514, 92 S. Ct. 2182, 33 L.Ed.2d 101 (1972).

*United States v. Marion* made explicit what was at best implicit in *Lawless* as to the moment at which the right to a speedy trial first attaches, at 404 U. S. 320:

> "[I]t is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment."

2. *Snyder v. Massachusetts*, 291 U. S. 97, 54 S. Ct. 330, 78 L. Ed. 674. And see Chief Judge Orth in *State v. Dubose*, 17 Md. App. 295, 301 A. 2d 32, at 36, "[The granting of the motion to dismiss] did preclude the rights of public justice, because it meant that Dubose, charged with a serious crime, went free without being tried."

3. We have since considered the question in fifteen additional reported decisions: *Hoss v. State*, 13 Md. App. 404, 283 A. 2d 629; *Kelly v. State*, 14 Md. App. 287, 286 A. 2d 806; *Bowie v. State*, 14 Md. App. 567, 287 A. 2d 782; *State v. Hamilton*, 14 Md. App. 582, 287 A. 2d 791; *Carter v. State*, 15 Md. App. 242, 289 A. 2d 837; *Thompson v. State*, 15 Md. App. 335, 290 A. 2d 565; *Young v. State*, 15 Md. App. 707, 292 A. 2d 137, aff'd, 266 Md. 438, 294 A. 2d 467; *State v. Hunter*, 16 Md. App. 306, 295 A. 2d 779; *Smith v. State*, 16 Md. App. 317, 295 A. 2d 802; *Sylvester v. State*, 16 Md. App. 638, 299 A. 2d 129; *Williams v. State*, 17 Md. App. 110, 299 A. 2d 878; *State v. Dubose*, 17 Md. App. 292, 301 A. 2d 32; *Collins v. State*, 17 Md. App. 376, 302 A. 2d 693; *McIntyre v. State*, 17 Md. App. 526, 302 A. 2d 672; *Fowler v. State*, 18 Md. App. 37, 305 A. 2d 200.

Since the Sixth Amendment, by its terms, provides that "in all criminal prosecutions *the accused* shall enjoy the right to a speedy and public trial," we look to the moment when an individual first becomes an "accused" for the engagement of the Sixth Amendment gears which sets the speedy trial clock to running. In *State v. Hamilton*, 14 Md. App: 582, 287 A. 2d 791, Chief Judge Orth incisively analyzed the holding and impact of *Marion.*

If *Marion* resolved a possible ambiguity, *Barker v. Wingo* changed the Maryland law in one significant regard. It left unchanged our traditional approach to speedy trial analysis to the effect that, in evaluating the claim, four factors come into play:

(1) The length of the delay,
(2) The reason for the delay,
(3) Prejudice to the accused, and
(4) Waiver.

*Hall v. State*, 3 Md. App. 680, 685-686, 240 A. 2d 630; *Lawless*, at 227. We had, however, treated the waiver factor as "a self-contained phenomenon". We had held that the failure to demand a speedy trial could, under appropriate circumstances, in and of itself "dispose of a contention that an accused had been denied a speedy trial, no matter what the other factors may involve," unless the accused showed actual prejudice. *Lawless*, at 227-229; *Fabian v. State*, 3 Md. App. 270, 286, 239 A. 2d 100. Where waiver did not dispose of the contention, we then looked to the interaction of the three remaining factors, to "the delay-reason-prejudice complex".

In the first full analysis of the speedy trial right ever undertaken by the Supreme Court, *Barker* ameliorated the foreclosing effect of waiver, in one of its aspects at least. It rejected the so-called "demand-waiver doctrine," whereby "a defendant waives any consideration of his right to speedy trial for any period prior to which he has not demanded a trial".[4] In eschewing the absolutism of the "demand-waiver

---

4. *Barker* cited the American Bar Association Minimum Standards in its criticism of the "rigid demand-waiver rule":

" 'One reason for this position is that there are a number of

doctrine", however, the Supreme Court by no means relieved a defendant of his responsibility and obligation to demand trial. That factor, although no longer able to operate in a vacuum, nevertheless remains a strong consideration in the ultimate equation. *Barker* said, at 407 U. S. 528-529:

> "We reject, therefore, the rule that a defendant who fails to demand a speedy trial forever waives his right. This does not mean, however, that the defendant has no responsibility to assert his right. We think the better rule is that the defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right. Such a formulation avoids the rigidities of the demand-waiver rule and the resulting possible unfairness in its application. It allows the trial court to exercise a judicial discretion based on the circumstances, including due consideration of any applicable formal procedural rule. It would permit, for example, a court to attach a different weight to a situation in which the defendant knowingly fails to object from a situation in which his attorney acquiesces in long delay without adequately informing his client [5] or from a situation in which no counsel is appointed. It would also allow a court to weigh the frequency and force of the objections as opposed to attaching significant weight to a purely *pro forma* objection.[6] "

Unchanged is our law that a defendant's conduct which causes delay will not redound to the detriment of the State,

---

situations, such as where the defendant is unaware of the charge or where the defendant is without counsel, in which it is unfair to require a demand.' " 407 U. S. at 528, n. 28.

Maryland, of course, had never applied its "demand-waiver doctrine" so rigorously. We exempted from the demand requirement, those not in a position fairly to make demand. *Lawless*, at 228-229.

5. See footnote 4 above.

6. See *Lawless*, at 228, n. 8, dealing with a demand "followed by a failure to reassert or to re-press the demand."

whether the result is reached by simply subtracting this time period from the "delay" factor *ab initio* or by considering it as "waiver" by affirmative conduct. See *Lawless,* at 228, n. 8; *State v. Oglesby,* 8 Md. App. 415, 418, 260 A. 2d 363. *Barker* is very emphatic on this point, at 407 U. S. 529:

> "We hardly need add that if delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine, the demand rule aside."

A close reading of *Barker* makes evident that waiver generally of the right to a speedy trial has not been eroded, but only that variety of waiver formerly inferable from the failure to make a demand.

The net effect is that the mere failure to demand a speedy trial is no longer an *ipso facto* waiver of the speedy trial right, but is rather but one factor to be considered in interaction with the three others. See *State v. Hunter,* 16 Md. App. 306, 314-315, 295 A. 2d 779. The continuing and heavy impact of non-demand, even in its new role as a constituent factor, is nonetheless made very clear by *Barker,* at 407 U. S. 532:

> "We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial."

We have now, therefore, as a tool of analysis, the four-factored calculus of delay-reason-assertion of right-prejudice.

With these tools, we approach the case at bar.

### The Delay

The appellee, Marion Thomas Jones, was charged with committing an armed robbery on March 14, 1970, upon Oscar Fremont Smith, a fellow construction worker. No pre-indictment arrest was made. The first formal action in the case was the indictment by the Grand Jury for Prince

George's County on May 20, 1970. That was the day on which the appellee became an "accused"; that was the time at which his right to a speedy trial engaged.

On the same day that the indictment was handed down, a bench warrant was issued for the appellee's arrest. The complicating factor in the case was that the appellee lived in the District of Columbia. Mrs. Enid Smith, a clerk with the Warrant and Fugitive Squad of the Prince George's County Sheriff's Department, testified that she received the bench warrant on May 22, 1970, two days after the indictment was handed down. A routine investigation "checking the employment, last known address, and so forth" was conducted by the Sheriff's Department. It ascertained the last known address as "2614 University Place, N.W., Washington, D.C." A cover letter containing that information and a copy of the arrest warrant were forwarded to the Metropolitan Police Department of Washington, D. C., on June 2, 1970.

The information furnished by the Prince George's County Sheriff's Office to the Metropolitan Police Department as to the appellee's residence was correct as of the time it was furnished. The appellee did reside at 2614 University Place, N.W., during the spring of 1970. He subsequently moved away. Whether he moved away, however, before the Metropolitan Police had a fair chance to serve him or at some later time during the ensuing year is highly problematical. At the ultimate hearing on the motion to dismiss the indictment, held on May 15, 1972, the appellee's efforts to establish just when he left 2614 University Place were hopelessly inconsistent. At one point, he testified that he thought that he had remained at that residence for about a year after the date of the alleged offense. That would have brought him down to March, 1971, and would have given the Metropolitan Police a nine-month opportunity to have reached him at a correct address. At another point in his testimony, however, the appellee stated that he had been living at his present address of 2501 17th Street, N.W., for five months, and that he had lived at 2910 13th Street, N.W., for a year prior to that. This would have taken him out of 2614 University Place in December, 1970, at the very latest.

A third and possibly fourth version of the move from 2614 Univeristy Place entered the picture with the testimony of the appellee's wife. She was sure that the move away from that address had been effected during the summer months. After tentatively identifying the date of the move as the summer of 1971, she admitted that she could not be sure whether they had moved during the summer of 1971 or the summer of 1970. She thought that the move had been a year or a year and one-half before. She placed the most recent move from 2910 13th Street, N.W., to 2501 17th Street, N.W., as of "the first of the year", that is, as of January, 1972. Before that was a year at 2910 13th Street, arguably eliminating the summer of 1971 for the move away from 2614 University Place.

If that first move was, indeed, in the summer of 1970, it would have thwarted the efforts of the Metropolitan Police Department to make successful service at what had been theretofore a correct address. In any event, for whatever the reason, the Metropolitan Police failed to come up with the appellee.

On October 23, 1970, the State's Attorney's Office received the permission of the court to place the case upon the stet docket for the reason that the appellee had not yet been located or arrested. The bench warrant, however, remained in full force and effect. The State made it clear that the entry of the stet was only for "administrative purposes," in order not to carry an inactive case on the active docket. It was the clear intent of the State to remove the case from the stet docket and to proceed with trial immediately upon the apprehension of the appellee. The entry of the stet, moreover, does not appear to have affected in any fashion whatsoever the effort, however diligent or however lackadaisical it may have been, to locate the appellee. The stet appears to have been a mere bookkeeping device.

The Sheriff's Office of Prince George's County received its first official return upon its request to the Metropolitan Police Department on September 14, 1971. The formal response was, "Unable to locate, subject not living at given address." This return came some fifteen months after the request had been forwarded.

Mrs. Smith then described the standard procedures to be followed after a responding jurisdiction has indicated that it is unable to locate a wanted suspect. She indicated that those procedures were followed in the case at bar. The State's Attorney's Office was asked whether it would authorize extradition of the appellee. It responded, on October 5, 1971, that it would so authorize. This triggered two implementing procedures. Authorization for extradition within a limited geographic radius is enough to place a look-out for the appellee on the M.I.L.E.S. computer.[7] That means that if at any time a wanted person should show up anywhere in Maryland, or in surrounding jurisdictions whose computerized systems are connected with our own, for a routine traffic charge or for any other reason, he would be immediately "red-flagged" as wanted. The even fuller authorization by the State's Attorney's Office to extradite the appellee from any point in the United States brought the F.B.I. into the picture. That blanket authorization of extradition is their prerequisite for taking out a Fugitive Warrant and for apprehending the wanted person wherever he may be found in the country. In the act of putting this additional machinery into operation, the Sheriff's Department fed in certain supplementary information about the appellee. They had a new address, which turned out not to be the appellee's address but which was that of the appellee's brother.

Using the brother's address, the F.B.I. located and arrested the appellee on March 15, 1972. On March 23, he waived formal extradition and was returned to Maryland. He was brought before the Circuit Court for Prince George's County for arraignment on March 29, 1972. At that time, the State asked to remove the case from the stet docket. When the appellee objected, the arraignment judge declined to make a ruling but rather set the case down for a further hearing upon the State's motion to remove the case from the stet docket, as well as on the appellee's habeas corpus petition seeking immediate release. That hearing was held on May 15, 1972, before Judge James H. Taylor. Judge Taylor denied the habeas corpus petition, granted the State's

7. Maryland Integrated Law Enforcement System.

motion to remove the indictment from the stet docket, and then further granted the appellee's oral motion, made on that day, to dismiss the indictment for the lack of a speedy trial. The State appeals that granting of the motion to dismiss.

From that history, we must now reckon the period of delay. The total lapse of time from the appellee's indictment until Judge Taylor's granting of the motion to dismiss the indictment was just five days less than two years — from May 20, 1970 to May 15, 1972. Recognizing, however, that the right to a "speedy trial" is not the right to an immediate trial, and that time must be allowed for the orderly processing of the case, we reckon as "delay" only the passage of time beyond that which is the obvious requirement of orderly procedure. We are, therefore, not concerned with the initial two-week period between May 20 and June 2, 1970. During that time, the case was processed with commendable expedition, as the bench warrant followed the indictment, the bench warrant was forwarded to the Prince George's County Sheriff's Department, routine checks were completed there, and the arrest warrant was forwarded to the Metropolitan Police Department of Washington, D.C. Nor are we concerned with the period between October 5, 1971, and May 15, 1972. After October 5, 1971, when both the M.I.L.E.S. computer and the F.B.I. were alerted to be on the look-out for the appellee and the State was committed to bear the expense of extradition from any place in the country, the State had done all that it could reasonably have been expected to do. From the arrest of the appellee on March 15, 1972, through his arraignment on March 29 and the hearing on May 15, the processing of the case moved forward with admirable dispatch. Even before we examine the question of fault, the only period of true "delay" to be reckoned with is, therefore, that period between June 2, 1970, and October 5, 1971 — a period of sixteen months.

### The Threshold Question of "Constitutional Dimension"

Our threshold question in considering speedy trial claims

is that of whether there has been any true "delay" in the constitutional sense. If, upon preliminary examination, we may determine that there has been no "delay" of "constitutional dimension" — if the claim of "speedy trial" denial is clearly frivolous — if the passage of time is patently not inordinate — we are relieved of all necessity to make further analysis. If this threshold of "constitutional dimension" has not been crossed, there is no need for the delicate weighing of social values in order "to balance the right of the individual to obtain a speedy trial against the right of society to punish those who are properly shown to have committed a crime against it." There is no need to look to the subtle interaction of the four factors: (1) length of delay, (2) reason for delay, (3) prejudice to the accused, and (4) assertion of the right by the accused. *State v. Lawless*, at 229-232.

Under the facts of this case, the appellee has successfully crossed the theshold of "constitutional dimension". A lapse of sixteen months between the initial request to the Metropolitan Police Department and the next escalation of the search process is significant and it is worthy, under the Sixth Amendment, of further analysis.

### The Reason for Delay

Since the only delay which is computed in the first instance is that chargeable to the State, an examination of the reason for that delay becomes, by definition, an examination of motivation on the part of the State or, in many of the cases, "fault" on the part of the State, either in affirmatively bringing about the delay or in inadvertently permitting it to occur.

*Barker v. Wingo* recognized, as we did in *Lawless*, that "fault" is a relative notion and that different weights should be assigned to different reasons for delay. The Supreme Court said, at 407 U. S. 531:

> "Closely related to length of delay is the reason
> the government assigns to justify the delay. Here,
> too, different weights should be assigned to

different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government. A more neutral reason such as negligence or over-crowded courts should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay."

There was in the case at bar clearly no "purposeful or oppressive" delay, motivated by "bad faith" or representing "a deliberate choice for a supposed advantage." In terms of assessing "fault," the behavior of the State clearly did not fall under the interdict of "purposefulness" or "oppressiveness".

Nor was there any persistent refusal to move forward in the face of repeated demands, requests and efforts by an accused to bring the case on for trial. The situation at bar was not such that the attitude of the State could be described as "capricious," "arbitrary" or "unreasonable" — the sort of motivational attitude we deplored in *Caesar v. State,* 10 Md. App. 40, 49-50, 267 A. 2d 750.

The case at bar presents us not with an instance of deliberate, knowing inaction but rather with an instance of what might, at the very worst, be characterized as "inadvertent inaction" or as "halting and less-than-diligent action". *Lawless,* at 237-241. Fault, if any, was minimal or for what *Barker* referred to as a "more neutral reason".

It is by no means certain, moreover, that there was indeed any fault, even of this less damning variety. During all but the final three weeks of the period of delay now before us for analysis, the arrest warrant was in the hands of the Metropolitan Police of the District of Columbia. The request was forwarded to them on June 2, 1970. They replied that they had failed to locate the appellee on September 14, 1971. Between September 14 and October 5, the Sheriff's

Department of Prince George's County moved swiftly to notify the State's Attorney's Office, to obtain authority for extradition, to place a look-out for the appellee on the M.I.L.E.S. computer, and to request the F.B.I. to issue a Fugitive Warrant.

If the appellee moved from University Place early in the summer of 1970, as well he may have from the vague and scanty evidence before the court below, then the Metropolitan Police were quite understandably "unable to locate" him. It is true, as he reminds us, that the appellee had not dropped from the face of the earth. It is equally true, regrettably but realistically, that, however short it may fall of the resourcefulness of an Inspector Javert or the Northwest Mounted Policeman of childhood fable, the service of process in urban centers today consists of little more than a one-shot trip to the single address appearing on the face of the paper to be served. For understaffed and overtaxed sheriff's offices and police departments, the handling of thousands of routine requests on an assembly line basis has become, lamentably, the standard, even if not the ideal, of urban court administration. When suspects drop, even unwittingly, from sight, law enforcement is frequently reduced to waiting for them to show up, sometime, somewhere. The intrepidity of a Henry M. Stanley cannot be the minimum standard for the tolling of the speedy trial calendar.

Moreover, even if the move from University Place came later and even if the Metropolitan Police failed in their mission, the State of Maryland will not be held to answer because some other commonwealth's "constable blundered."

The appellee's ascription of fault to Maryland is, therefore, reduced to a single plaint. He argues that Prince George's County should have acted sooner to escalate the search, by plugging in the M.I.L.E.S. computer or by calling out the F.B.I. even pending formal acknowledgment of failure by the Metropolitan Police. With respect to M.I.L.E.S., no evidence was offered as to when that recent and innovative tool became operational or as to what liability, by way of commitment to extradition, might be

incurred by feeding a "wanted notice" into its memory cells. The utilization as well as the development of M.I.L.E.S., and similar imaginative new approaches, by Maryland, and by others, represents a highly commendable effort to fashion new tools to deal with today's almost overwhelming problems of investigative and prosecutorial mass production. We will not "fault" either the Sheriff's Department or the State's Attorney's Office of Prince George's County as they struggle, yet imperfectly perhaps, to develop such new and better techniques.

Nor will a commitment to carte blanche all-points extradition, the prerequisite for calling in the F.B.I., be accepted as the measure of due diligence. Extradition budgets are not only finite but generally straitened. We do not read the Sixth Amendment to say that a county of Maryland will be foreclosed from proceeding against a middle echelon fugitive it should fortuitously chance upon, simply because it has been unwilling, or indeed unable, to commit itself, sight unseen, to bear hypothetical extradition costs from Nome or Honolulu.

If the evidence upon the merits should ultimately establish that the appellee came from without the State, committed a crime here, and then left, the law's delay as to him was largely because of the jurisdictional complications which he, wittingly or unwittingly inflicted upon it. For the State's part, the worst that could be said is not that the proper steps were not taken initially, but only that the Sheriff's Department or the State's Attorney's Office either lacked the resources, or had not devised a technique, for obtaining periodical status reports on dormant cases. Fault, if any, on the part of Prince George's County was minimal.

### Assertion of the Right

This factor, in the equation at bar, is zero. The appellee did not know of the charges against him and was, therefore, in no position to make demand. His silence, under the circumstances, cannot redound to his detriment. Conversely, the State cannot be charged with indifference or inaction in the face of repeated demands for action, since such

demands, understandably, were never made. The demand factor is neither a plus nor a minus for either party.

### The Presumption-Generating Question of "Substantial" Delay

At a hearing upon a motion to dismiss charges because of an alleged denial of the right to a speedy trial, the burden of proof (that is, the risk of non-persuasion of the hearing judge) is initially upon the accused, as he is the moving party. He may produce initially, and the State may produce by way of response, any evidence available on the questions of length of delay, reason for delay, and demand for a trial. In the weighing of these questions, no presumptions are thrown into the balance on either side of the scales. Because of its more speculative nature, however, the question of prejudice cannot be so straight-forwardly handled.

A certain quantitative and qualitative degree of delay gives rise to a rebuttable presumption of prejudice and will shift the burden of going forward with the evidence from the accused to the State. Before that critical point is reached, there rests upon the accused, as the moving party, the burden of persuading the hearing judge that he has suffered actual prejudice or the strong possibility of prejudice. Once that critical point has been reached, however, the presumption of prejudice arises and the burden of going forward with the evidence shifts to the State. That critical point on the delay scale where the presumption arises and the burden shifts has been denominated the point of "substantial" delay. *Lawless*, at 233; *Stevenson v. State*, 4 Md. App. 1, 13-15, 241 A. 2d 174.

There is no precise measuring rod by which to determine when a delay becomes "substantial"; that determination must be made in the light of the facts and circumstances of each particular case. *Wilson v. State*, 8 Md. App. 299, 306, 259 A. 2d 553; *Caesar v. State*, at 10 Md. App. 43. Just as the other three factors interact with the factor of "length of delay" in determining the ultimate constitutional question of whether a speedy trial has been denied, so too, to the extent to which evidence as to them has been adduced, by

whomsoever produced, do they bear upon the intermediate and procedural question of whether that delay is "substantial." We begin, therefore, with the proposition that the period of delay, even as to this intermediate issue of whether it shall be deemed "substantial," must be considered only in relation to the other three factors. If our words about relativity mean anything, it is that in the algebra of the Sixth Amendment even a greater delay coupled with non-oppressive and non-purposeful motivation and coupled with a lesser likelihood of prejudice may well yield a product less "substantial" than would a significantly shorter delay coupled with oppressive or purposeful motivation and coupled with a greater likelihood of prejudice. Compare *Caesar v. State, supra,* and *Wilson v. State, supra,* where delays of 12 months and 17 months, respectively, were held to be "substantial," with *Brown v. State,* 4 Md. App. 141, 241 A. 2d 901; *Frazier v. State,* 5 Md. App. 88, 245 A. 2d 614; *King v. State,* 6 Md. App. 413, 251 A. 2d 628; *Stevenson v. State, supra,* and *State v. Williams,* 6 Md. App. 5, 249 A. 2d 503, where delays of 14 months, 16 months, 21 months, $21^{1}/_{2}$ months and 23 months, respectively, were held to be "not substantial."

It is, therefore, axiomatic that the mere running of the calendar will not be viewed in isolation and has little significance divorced from the questions of motivation for delay, assertion of the right and probable prejudice.

Upon our constitutionally mandated, independent review, we cannot agree with Judge Taylor that the period of delay here was "substantial" and that prejudice should be presumed. A delay of 16 months, coupled with the understandable absence of any demand for trial, coupled with no likelihood of prejudice to the person of the appellee and no demonstrated prejudice to the defense of the appellee, coupled with the most minor, if any, fault on the part of the State, does not yield the combination which should trigger the presumption of prejudice.

In the absence of a presumption of prejudice, the appellee, as will be discussed below, clearly did not carry his burden of demonstrating prejudice. Even a finding of prejudice,

proved or presumed, would not, moreover, necessarily dispose of the ultimate issue in the appellee's favor. That prejudice factor would still have to be balanced with all of the other factors in resolving the ultimate issue of whether the Sixth Amendment had been violated.[8] See generally *Lawless*, at 232-237.

### Prejudice

Even if the period of delay at bar were deemed to be "substantial," however, and even if prejudice were to be presumed, however, we would still be persuaded, upon our independent constitutional review, that the evidence resoundingly dissipated that presumption.

*Barker v. Wingo* clearly identified the interests protected by the Sixth Amendment, at 407 U. S. 532:

> " . . . Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."

During the entire "delay" period under analysis, from June 2, 1970, through October 5, 1971, the appellee was blissfully unaware that charges had been placed against him. There was, therefore, not one iota of oppressive pretrial incarceration nor one iota of anxiety or concern. What we identified in *Lawless, Fabian, Stevenson,* and *Oglesby* as "prejudice to the person of the accused" was absolutely zero.

We now turn to possible prejudice to the defense. The type

---

8. Strong prejudice to a defense could occur if a key witness were to die or a key document were to disappear a few weeks, or even a few days, after arrest or indictment. That prejudice alone obviously could not resolve the ultimate issue in a defendant's favor, but would represent a single constituent factor in the larger equation. And see *United States v. Marion,* at 404 U. S. 324-325:

> "Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution."

of trial to be expected at bar was quite clearly indicated by the peripheral evidence adduced at the hearing. Involved here was no tenuous identification of a stranger, whereto alibi evidence might well have been a successful defense. The victim and the appellee knew each other by name and had worked, at least occasionally, on the same construction sites. The victim described the appellee's automobile right down to the last digit of the license number. Clearly forecast was a stark contest of credibilities: the victim would claim that the appellee had robbed him; the appellee would deny it.

There was no claim that any defense witness had disappeared. There were no lost documents.[9] The only argument advanced by the appellee, on the question of prejudice to the defense, is that he cannot remember what he did on Saturday, March 14, 1970. He only knew that he generally "played a lot of ball" on Saturdays. He did check employment records and found that he had not worked on the Saturday in question. The unusual posture of the appellee at bar, in not having known that a case had been instituted against him, makes his predicament more akin to that of those who claim due process violations where long delays are involved before the initial institution of prosecution, rather than to those in more typical speedy trial situations. *United States v. Marion* addressed itself to the claim of faded memory [10] and gave it short shrift, so long as the applicable statute of limitations was not offended, at 404 U. S. 325-326:

> "No actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some

---

9. In this regard, we cannot help but note an argument in the appellee's brief which seeks to exploit certain testimony unabashedly out of context:

"Indeed the Joneses had somehow lost or misplaced the very records by which they might have been able to reconstruct a defense to the crime charged." (Appellee's brief, p. 34)

The records referred to were rent receipts, relevant only to the question of the month and year in which the Joneses had moved away from University Place. There was never the faintest intimation that they could have had the remotest bearing on the question of guilt or innocence.

10. The delay in *Marion* was of 38 months.

tactical advantage over appellees or to harass them. Appellees rely solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost. In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment."

Acuteness of memory for fine detail appears, moreover, to be no consideration, where the appellee is apparently ready to deny flatly any involvement in the incident at all. He could presumably remember whether he did or did not rob the victim. And see *Lawless*, at 13 Md. App. 241-243, where we held without merit "simply the bald allegation of the appellee himself that he cannot now remember his whereabouts on the day of the alleged offense."

We see no prejudice to the person of the accused and only the most speculative possibility of prejudice to the defense of the accused.

### The Ultimate Speedy Trial Question

A delay of sixteen months coupled with little or no fault on the part of the State coupled with no prejudice to the person of the accused and little or no prejudice to the defense of the accused does not amount to a denial of the right to a speedy trial. We feel that the hearing judge was wrong in foreclosing the right of the State of Maryland to bring an accused felon to book. We reaffirm what we said in *McIntyre v. State, supra:*

"The law does not lightly wield a sanction so ultimately destructive of society's fundamental right to have transgressors stand before the bar of justice upon the merits of the cause."

### The Cross-Appeal: Habeas Corpus

On March 24, 1972, the day after his return to Maryland,

the appellee and cross-appellant (hereinafter referred to simply as the appellee) petitioned for a writ of habeas corpus releasing him from custody. The grounds advanced were essentially that his Sixth Amendment right to a speedy trial had been denied. The memorandum in support of the petition made manifest the speedy trial nature of the claim. At the aborted arraignment of March 29, the petition for the writ, as well as the arraignment and the State's motion to remove the case from the stet docket, was put over to the hearing before Judge Taylor on May 15. In the meantime, the appellee was released on a reduced bail. Judge Taylor denied the writ of habeas corpus, ruling that it was not the appropriate vehicle to test a speedy trial claim. The appellee appeals that denial.

Even while noting our agreement with Judge Taylor as to the inappropriateness of habeas corpus to contest a speedy trial claim, we rest our holding on the non-appealability of the denial of the writ. Chief Judge Murphy stated the law as to appealability of habeas corpus decisions so lucidly and so succinctly in *Hudson v. Superintendent,* 11 Md. App. 253, 273 A. 2d 470, that it is bewildering that it can still be misconstrued. The general rule is that an adverse decision in a habeas corpus hearing cannot be appealed from. There are three narrowly limited exceptions to that rule. They are 1) in extradition cases, under Article 41, Section 25; 2) where a prisoner has been released upon the ground that the law he was charged with violating is unconstitutional, under Article 42, Section 19; and 3) in bail cases, under Article 42, Section 20. The present case is none of these. The cross-appeal in this regard is dismissed.

### The Cross-Appeal: The Stet

The appellee also challenges by way of cross-appeal the very procedure of the "administrative stet" as unconstitutional. The short answer to the challenge is that the granting by the court of the State's motion to remove the indictment from the stet docket was interlocutory in nature and, as such, is not immediately appealable. Maryland Rule 1035; *Harris v. State,* 6 Md. App. 7, 249 A. 2d 723; *Raimondi v. State,* 8 Md. App. 468, 261 A. 2d 40.

This normally would end the matter. Because, however, the question is one of general importance and concern, at least in Prince George's County, we are constrained to express our opinion with regard thereto. *Kardy v. Shook*, 237 Md. 524, 207 A. 2d 83; *State v. Musgrove*, 241 Md. 521, 217 A. 2d 247.

Initially, we read the adjective "administrative" as mere editorial surplusage. A stet is a stet; the species has not subdivided. The origins of the stet are obscure. The only reference to "stet" or "stet processus" in *Black's Law Dictionary* (4th Edition) indicates the civil origins of the terminology:

> "Stet Processus. An entry on the roll in the nature of a judgment of a direction that all further proceedings shall be stayed, (i.e., that the process may stand,) and it is one of the ways by which a suit may be terminated by an act of the party, as distinguished from a termination of it by judgment, which is the act of the court. It was used by the plaintiff when he wished to suspend the action without suffering a nonsuit."

The first discovered reference to the "stet" in Maryland is in *State v. Morgan*, 33 Md. 44 (1870) in a passing sentence, distinguishing it from a *nolle prosequi*, at 46:

> "And so, where a *stet* has been entered in a criminal case, it is not ordinarily a final determination or acquittal of the party accused; but he remains liable to be proceeded against under the same indictment."

As early as 1870, however, the Court of Appeals seemed to take the existence of the "stet" very much for granted. Hochheimer in his *Crimes and Criminal Procedure* (2nd Edition, 1904) exhausted the subject in a paragraph:

> "§ 153. Stet. — *Stet processus* is an entry of record, in the nature of a judgment, of a direction that all further proceedings shall be stayed, and it is one of the modes in which a suit may be terminated by the

act of the party, as distinguished from a determination of it by judgment of the court. In criminal cases this entry is made in the discretion of the prosecuting attorney. It is of a nature similar to *nolle prosequi.* The accused remains liable to be proceeded against under the same indictment. The form used is an order to the clerk, filed in the particular case, to 'enter stet,' or the prosecuting atttorney may endorse the indictment 'stetted.' "

*Barrett v. State,* 155 Md. 636, 638, 142 A. 96 (1928) and *Lifshutz v. State,* 236 Md. 428, 437, 204 A. 2d 541 (1963) simply refer in a sentence or two to the right of the State to reinstate a stetted case.

Formerly, a stet could be entered in a case within the sole discretion of the prosecuting attorney. On July 12, 1965, however, the addition of Rule 718 to the Maryland Rules of Procedure provided that, "A case may be placed upon the stet docket only by order of court." *Brown v. State,* 2 Md. App. 388, 396-397, 234 A. 2d 788. The stet, in Maryland, is simply an indication by the prosecutor, acquiesced in by the court, that he does not choose *at that time* on that indictment to proceed further with the prosecution. *Regle v. State,* 9 Md. App. 346, 353, 264 A. 2d 119; *Smith v. State,* 16 Md. App. 317, 322-323, 295 A. 2d 802.

Although the Maryland terminology of "stet" appears to be unique, the practice of suspending active prosecution is not unique. In North Carolina and South Carolina (and arguably Alabama), the use of the "nolle prosequi" or the "nolle prosequi with leave" [11] serves essentially the same function as the Maryland "stet," rather than the function served by the "nolle prosequi" in most jurisdictions, which serves to terminate rather than to suspend prosecution.[12]

---

**11.** The difference between the "nolle prosequi" and the "nolle prosequi with leave" is that the approval of the court is required to reinstate an indictment which has been nolle prossed, but no judicial approval is required (upon the theory that it has been obtained in advance) to reinstate an indictment which has been "nolle prossed with leave."

**12.** In "Nolle Prosequi," 2 Southern Law Review 346 (1876), Joel Bishop, at 354-355, severely criticizes the inappropriate terminology in North Carolina and South Carolina, blaming it upon the uncritical following in those two states of an unsubstantiated, and indeed erroneous, statement of law in Chitty's *Criminal Law.*

*Klopfer v. North Carolina,* 368 U. S. 213, 87 S. Ct. 988, 18 L.Ed.2d 1, recognized the procedure as valid, but struck down its application in that particular case, where the prosecution was suspended indefinitely, over the express objection of Klopfer. The similarity between the North Carolina procedure and the Maryland "stet" was recognized by *Klopfer,* at 386 U. S. 220, n. 5. See also *Brown v. State, supra,* at 397.

A third and more widespread variation on the same theme (the variation being only terminological) is in the practice referred to in several states as "Filing away an indictment" or "Passing an indictment to the files." See *Byrd v. State,* 179 Miss. 336, 175 So. 190; *Commonwealth v. Smith,* 140 Ky. 580, 131 S. W. 391. And see Annotation, "Effect of passing indictment to files," 18 A.L.R. 1153 (1921).

41 Am.Jur.2d, *Indictments and Informations,* § 37, "Reinstatement of indictment or information passed to files," summarizes the law as follows:

> "In some jurisdictions, the practice of passing an indictment to the files exists for the purpose, among others, of holding the charge in abeyance. Such proceeding does not amount to a nolle prosequi or dismissal of the charge and has not the effect of an acquittal, and it has been held that it amounts to nothing more than a postponement of the time of trial, and that the indictment may be withdrawn from the files and reinstated for trial at a future term. The state's attorney cannot be estopped from so reinstating the indictment by an agreement with the accused not to do so except under stated conditions."

To a like effect, see 42 C.J.S., *Indictments and Informations,* § 30, "Filing away and Reinstatement of Indictment":

> "Except where the accused is before the court and objects to the order, the court may file away an

indictment and subsequently reinstate it on the docket.

> It is permissible for the court to file away an indictment and subsequently reinstate it upon the docket, as where accused is not apprehended or arrested until after the filing away, or where this action is taken on agreement with accused; and an order entered without objection on the part of accused may have this effect, although not expressly providing therefor; but this is not permissible where accused is before the court and objects to the order, as it would violate his constitutional right to a speedy trial."

And see *Klopfer v. North Carolina, supra,* 386 U. S. 220, n. 5, for the essential similarity in these three procedures, notwithstanding the differences in terminology.

In all events, it is clear that the procedure is applicable to two essentially different situations. Where a defendant's whereabouts are known, he has a right, fundamentally on speedy trial grounds, to object to the "stetting" of a case against him and to demand a trial or other disposition. That objection would be a factor to be considered by the judge in determining whether to permit the "stet." In all of those cases where the whereabouts of a defendant are not known or where the defendant cannot be produced in court, it is perfectly permissible for the State to petition the court *ex parte* for the entry of the stet. There is no requirement that a defendant consent to a "stet." Nonconsent, therefore, is no impediment to the removal of a case from the stet docket. If the State's Attorney's Office of Prince George's County wishes, for internal bookkeeping purposes or for public consumption, to classify one category of its stetted cases as "stets for administrative purposes," that is merely editorial surplusage and does not contaminate, erode or complicate in any fashion a perfectly proper procedure.

To have placed the present case upon the stet docket when the appellee could not be located was normal and proper; to

have removed the case from the stet docket once he was located was also normal and proper.

> *Order dismissing the indictment reversed; cross-appeal dismissed; case remanded for further proceedings in accordance with this opinion; mandate to issue forthwith; costs to be paid by appellee.*