# SMITH *v.* STATE OF MARYLAND

[No. 22, September Term, 1975.]

*Decided January 7, 1976.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Morgan L. Amaimo* for appellant.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court. O'DONNELL, J., concurs in the result and filed a concurring opinion at page 535 *infra.*

The issue presented for our consideration is whether the petitioner in this case was denied his rights to a speedy trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and by Article 21 of the Maryland Declaration of Rights. Because we conclude that these rights were violated, the petitioner's conviction must be reversed and the indictment dismissed.

The petitioner, Ramarro Lee Smith, in a seven-count indictment returned by the grand jury in Montgomery County on October 4, 1972, was charged with rape and related offenses. More than 15 months later, on January 23, 1974, trial commenced in the circuit court of that county before Judge Joseph M. Mathias and a jury. Upon conclusion of the trial on January 28, 1974, Smith was found guilty on five of the counts, including the one charging rape. Sentencing took place on April 16, 1974, and nine days later the petitioner noted a timely appeal to the Court of Special Appeals.[1] In an unreported decision, *Smith v. State,* decided December 27, 1974, that court affirmed the conviction,

---

1. Allowing for the concurrent and consecutive sentences imposed under the several counts, Judge Mathias directed that Smith be imprisoned for a total of 16 years.

holding *inter alia* that the trial court did not err when it failed to grant Smith's motion (premised upon an allegation that he had been denied a speedy trial) to dismiss the indictment. We granted certiorari, limiting our review solely to the speedy trial question.

Since, when contemplating this issue, time in relation to events is such a significant consideration, we shall chronicle in detail the incidents which preceded the petitioner's conviction. The crimes with which Smith was charged allegedly occurred on September 15, 1972. He was arrested and incarcerated the following day, and indicted shortly thereafter, on October 4. Two days later, after entering a plea of not guilty by reason of insanity, Smith was committed by court order to Clifton T. Perkins State Hospital for examination. The hospital's report, received by Judge Mathias on December 12, 1972, concluded that the petitioner was then competent to stand trial and that he was sane when the crimes allegedly were committed. Although Smith was returned on the 11th of December to the Montgomery County Detention Center to await trial, for no apparent reason his trial was not scheduled to begin until six months later, on June 11, 1973.

During this six-month period the State made no positive efforts to keep itself posted as to the whereabouts of the prosecutrix, Barbara Rae Linn. Thus it was not until June 7, 1973, that the Deputy State's Attorney discovered this complaining witness was no longer in the jurisdiction and consequently the summons which had been issued for her on May 30 could not be served. Realizing that Mrs. Linn's testimony was crucial to the State's case, he telephoned Police Lieutenant Skaife, one of the investigating officers, and requested that the officer immediately attempt to locate the missing witness. Having not heard from the lieutenant by the late afternoon of Friday, the 8th of June, the Deputy State's Attorney advised Circuit Court Judge Shure that he would be unable to proceed with the trial then scheduled to begin on the ensuing Monday morning. An office memorandum prepared by the State's Attorney for his deputy assigned to try the case summarizes a subsequent telephone conversation he had with the judge that same day:

> "Judge Shure indicat[ed] that he was not going to take the case off the docket, but was going to grant the continuance; that [defense counsel] was going to be in court for the record, but understood that the case should be entitled to a continuance when the witness disappears. *The Judge indicated he would like to try to restrict us to 30 days to prepare the case for trial.* I indicated we would not be able to if we had to extradite witnesses. He indicated we could dismiss our witnesses, since the case would not be tried on that date." (Emphasis added.)

Promptly following the conversation referred to in this memorandum, the State filed a formal motion for a continuance and advised its remaining witnesses that the case would not be tried on June 11, but would be rescheduled for a subsequent date. Still later that Friday afternoon, Lieutenant Skaife was notified that on Monday morning (June 11), though a formal hearing was necessary, the State's request for a continuance would be granted.

In what might be termed an unexpected turn of events, Mrs. Linn, having learned of the lieutenant's efforts to contact her, telephoned him from Mississippi that same Friday, in the evening, between 6:00 and 7:00 p.m. Although the prosecutrix indicated she was willing to appear and testify on Monday, the police officer informed her the State had already requested a continuance and that the trial would be set for another date. At the time of the June 11 hearing on the motion for a continuance, however, none of the participants in the hearing was aware of the fact that Mrs. Linn had been located. At that hearing counsel for Smith objected to the granting of a continuance, asserting that the State had had ample time to determine the whereabouts of its complaining witness and that he was then ready to proceed with the trial. He made oral motions to dismiss the indictment for lack of a speedy trial, for a speedy trial, and for release of his client on bond. Judge Shure, without specifically ruling on the petitioner's two speedy trial motions, granted the requested continuance, although in doing so he noted in his own handwriting on the

face of the order that "the Court is aware of the motion of defendant for a speedy trial," and by separate order directed that Smith be released on bond.

Upon learning that Mrs. Linn had been located and was willing to testify, the Deputy State's Attorney, on June 14, 1973, requested the assignment office to reschedule the case for trial as soon as possible. However, it was not until July 20, 1973, that the assignment office advised the parties that the trial had been reset for November 15. Alleging principally that his mental condition had deteriorated significantly since June 11 and that he was now unable to aid in his own defense, the petitioner filed another motion, on November 7, 1973, to dismiss his indictment on the ground that his right to a speedy trial had been denied. At the hearing on this motion held before Judge Mathias on November 14, Dr. David A. Lanham, a psychiatrist who had seen Smith frequently since November 12, 1972, for evaluation and treatment, testified that the petitioner's condition had worsened to the extent that he was unable to hold employment and also expressed doubt that Smith could at that time assist in his own defense. Confronted with this testimony, Judge Mathias recommitted the petitioner to Perkins Hospital, ordering it to complete and submit to the court a reevaluation within 14 days, and deferred ruling on the dismissal motion until the time of trial. Following a one-hour examination of the petitioner on November 26, the acting superintendent of the hospital reported to the court that in his opinion Smith's mental condition had improved substantially during the past year and that he was "presently able to understand the nature and object of the proceedings against him and to assist in his defense."

At a point undisclosed by the record, some time between November 14 and December 4, 1973, the trial was rescheduled to commence on January 3, 1974. However, because the principal investigating officer was to be out of the country on military assignment from December 16, 1973, to January 7, 1974, the State, on December 4, 1973, requested an additional continuance. The court, notwithstanding the petitioner's objection and renewed mo-

tion to dismiss for lack of a speedy trial, granted the continuance and the trial was reset for the 23rd of January.

Finally, more than 16 months after arrest and 15 months after indictment, the petitioner received his day in court. At his trial which was conducted on January 23, 24 and 28, Smith was found guilty and his speedy trial motions were denied. On appeal, the Court of Special Appeals, with Judge Davidson dissenting, concluded that, although the delay was of such duration that it "did reach constitutional dimensions," Smith's right to a speedy trial had not been violated.

Before demonstrating why we conclude these facts indicate that the petitioner was denied the prompt trial guaranteed him by both the State and Federal Constitutions, we will briefly discuss the interplay between these two constitutional provisions. Article 21 of the Maryland Declaration of Rights mandates "[t]hat in all criminal prosecutions, every man hath a right . . . to a speedy trial . . . ." Similarly, the Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . ." As pointed out by Judge Smith for this Court in *Erbe v. State*, 276 Md. 541, 545, 350 A. 2d 640 (1976), Judge Alfred S. Niles, in his authoritative treatise, *Maryland Constitutional Law* 13 (1915), divides the articles of the Declaration of Rights into four categories and places Article 21 in "Class C," denominated "Limitations on the power of the State similar to those limitations prescribed in the United States Constitution for the Federal Government." When construing "Class C" articles, Judge Niles concludes that

> "the decisions of the United States [Supreme] Court, in reference to the corresponding provisions of the Federal Constitution, are adopted by [the Maryland] court as authority which is very persuasive, although not necessarily controlling."

The accuracy of this statement has been demonstrated by decisions of this Court interpreting other rights protected by

"Class C" articles. *See, e.g., Brown v. State,* 233 Md. 288, 296, 196 A. 2d 614 (1964) (self-incrimination of Article 22 and Fifth Amendment); *Givner v. State,* 210 Md. 484, 492, 124 A. 2d 764 (1956) (search and seizure of Article 26 and Fourth Amendment); *cf. Bureau of Mines v. George's Creek,* 272 Md. 143, 156, 321 A. 2d 748 (1974) (due process of Article 23 and the Fourteenth Amendment; Niles places Article 23 in "Class B," entitled "Exact duplications of provisions found in the Federal Constitution"); *Goldsmith v. Meade Johnson & Co.,* 176 Md. 682, 686-87, 7 A. 2d 176 (1939) (same); Niles, *Maryland Constitutional Law* 48 (1915) (concluding that cases decided under the Fourteenth Amendment's due process clause "are practically direct authorities" as to the proper interpretation of the due process clause of Article 23). Although this Court has not previously definitively determined the relationship between the two constitutional speedy trial rights, we here conclude that the opinions of the Supreme Court interpreting the Sixth Amendment right to a speedy trial are "very persuasive, although not necessarily controlling," as to the proper construction of Maryland's parallel Article 21 right.[2]

The contours of the Sixth Amendment right to a speedy trial, applicable to the states through the Fourteenth Amendment, *Klopfer v. North Carolina,* 386 U. S. 213, 87 S. Ct. 988, 18 L.Ed.2d 1 (1967), were recently drawn by the Supreme Court in *Barker v. Wingo,* 407 U. S. 514, 92 S. Ct. 2182, 33 L.Ed.2d 101 (1972). Since the *Barker* decision was but a short time ago analyzed in considerable detail by Judge O'Donnell for this Court in *Epps v. State,* 276 Md. 96, 345 A. 2d 62 (1975), only a brief discussion is warranted here. In *Barker,* the Supreme Court adopted a balancing test in which the following four factors were deemed to be of

---

**2.** This Court, in cases decided prior to the United States Supreme Court's rejection of the demand-waiver doctrine in Barker v. Wingo, 407 U. S. 514, 523-28, 92 S. Ct. 2182, 2188-91, 33 L.Ed.2d 101 (1972), held that an accused waives his Maryland Article 21 right unless he affirmatively demands a speedy trial. *See, e.g.,* State v. Murdock, 235 Md. 116, 123, 200 A. 2d 666, *cert. denied,* 379 U. S. 914 (1964); Harris v. State, 194 Md. 288, 297, 71 A. 2d 36 (1950). Since in this case the petitioner repeatedly requested a prompt trial, we need not decide whether those pre-*Barker* cases are still viable.

primary importance in determining whether the right was violated: (1) length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant.[3] 407 U. S. at 530, 92 S. Ct. at 2191-92. We will discuss these considerations seriatim as they apply to the facts of this case.

### (1) *Length of Delay*

The interval between the time one becomes an "accused"[4] and the date his case is tried must be determined since unless that period is sufficiently extensive to be "presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker v. Wingo, supra,* 407 U. S. at 530, 92 S. Ct. at 2192. We conclude that *Epps,* 276 Md. at 111, 345 A. 2d at 72, is dispositive of that issue in this case since there this Court unanimously concluded that a one-year, fourteen-day delay was sufficient to require us to engage in the sensitive balancing procedure outlined in *Barker.* Inasmuch as the 16-month delay between Smith's arrest and trial exceeded that in *Epps,* a fortiori we must enter into the balancing process here. Additionally, the length of the delay, 16 months, should, by itself, be given some, but not determinative, weight.

### (2) *Reasons for the Delay*

In *Barker,* Mr. Justice Powell, for the Supreme Court, expressed the view that "different weights should be assigned to different reasons [for delay]." 407 U. S. at 531, 92 S. Ct. at 2192. Initially, he observed that "[a] deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government." *Id.* He

---

**3.** Although the Supreme Court did not preclude inquiry into factors other than the four mentioned, Barker v. Wingo, *supra,* 407 U. S. at 530, 92 S. Ct. at 2192, we find no other factors significant here.

**4.** A person becomes an "accused" for purposes of the Sixth Amendment when "either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge" occur. United States v. Marion, 404 U. S. 307, 320, 92 S. Ct. 455, 463, 30 L.Ed.2d 468 (1971); see Dillingham v. United States, 44 U.S.L.W. 3327 (U. S. Dec. 1, 1975) (per curiam); Epps v. State, 276 Md. 96, 109, 345 A. 2d 62, 71-72 (1975).

then indicated that prolongation of trial due to the negligence of state officials, understaffing of state offices or overcrowded courts, while not to be considered neutral, is to be "weighted less heavily" toward a finding of a violation of the Sixth Amendment right. *Id.; Strunk v. United States,* 412 U. S. 434, 436, 93 S. Ct. 2260, 2262, 37 L.Ed.2d 56 (1973). In connection with this, we point out that employees of a court's assignment office or of a state hospital, as well as prosecutors, policemen and judges, must be considered representatives of the State. The *Barker* Court added that "a valid reason [for postponing a trial], such as a missing witness, should serve to justify appropriate delay." 407 U. S. at 431, 92 S. Ct. at 2192. Lastly, in *Strunk v. United States, supra,* 412 U. S. at 436, 93 S. Ct. at 2262, the Supreme Court implied that if the reason for the delay is traceable solely to the accused, it should not be used to support the conclusion that the accused was denied a speedy trial.

In this case, it can be forcefully argued that every postponement of petitioner's trial occurring after Smith's first medical examination was caused by the State; consequently we must carefully scrutinize the justifications assigned by the State for each ensuing delay. Although, following his first trip to Perkins Hospital, the petitioner was returned on December 11, 1972, to the Montgomery County Detention Center to await trial, the date set for this event was June 11, 1973, a full six months later. While Smith may have been ready for trial prior to June 11, he made no request for an earlier trial date; in the absence of such a demand or of prejudice shown to have emanated from this interval, the pre-June 11 delay alone may not have been sufficient to have violated his constitutional right. We need not decide that question, however, since what subsequently occured, in our view, clearly tips the balance so as to require a finding that the petitioner's right to a speedy trial was violated.

As for the June 11 trial date itself, although the prosecutor was notified of it on March 14, 1973, the State made no serious effort to locate the complaining witness until a few days before the scheduled trial; the result was

that the State did not learn until June 7 that Mrs. Linn had left the jurisdiction. Even if this shortcoming was the consequence of being understaffed, any resulting delay would be, as we have already indicated, chargeable, though somewhat "less heavily," against the Government. Nonetheless, the trial could still have commenced on June 11 or shortly thereafter, despite Judge Shure's indication to the State's Attorney that the requested continuance would be granted and that the State could so inform its witnesses, had the Government informed the judge on or before June 11 that the missing witness, whose absence was the reason assigned for seeking the continuance, had been located. As they both represent the State, it matters not whether the police or the prosecutors were responsible for this lack of communication. Consequently, the reasons why the case was not tried on June 11 are all traceable to the State and, considering their nature, any delay resulting solely therefrom must be weighed against it. Although we need not reach the issue, if the petitioner's trial had taken place within a few days of June 11 it might well have been acceptable.

In our evaluation the crucial delay occurred between the original trial date of June 11, 1973, and November 15, 1973, the date on which the trial was first rescheduled to begin. Even though, once the Deputy State's Attorney learned that the prosecutrix had been located, he promptly asked the assignment office to "set this case for trial at the earliest available date," it was not until July 20, 1973, that the assignment office advised the parties that the trial was scheduled for November 15 of that year. No reason has been given for either the relatively long delay between the time of the request (June 14) and the time of the advisement (July 20) or for the inordinate length of time between June 11, the date originally set for trial, and November 15, the date on which the reset trial was to begin. Again, whether these protracted delays were the result of dereliction on the part of the State's Attorney's office or the assignment office is immaterial since both are agencies of the State. In this regard it must be remembered, as the Supreme Court

pointed out in *Barker,* that "[a] defendant has no duty to bring himself to trial; the State has that duty . . . ." 407 U. S. at 527, 92 S. Ct. at 2190 (footnote omitted). In view of the amount of time which had already elapsed, the petitioner's demand for a speedy trial and the circuit court's evident concern over the issue, the State should have made certain that the trial was promptly reset for a date in the immediate future, even if that required the rescheduling of other cases. If, as here, the trial date set by the assignment office is unsatisfactory in relation to the constitutional mandates, the State's Attorney's office should request an earlier date and, if necessary, ask the court to order compliance. *Epps v. State, supra,* 276 Md. at 114-15, 345 A. 2d at 74; *Jones v. State,* 241 Md. 599, 611, 217 A. 2d 367 (1966). We add that when a defendant makes known his desire to be furnished his constitutionally guaranteed speedy trial, it is incumbent upon the State to provide for trial at the earliest practicable date. *Epps v. State, supra,* 276 Md. at 114-15, 345 A. 2d at 74; *Jones v. State, supra,* 241 Md. at 610-11. Although the delay in this case might have been understandable, and possibly even acceptable, in an extremely congested court such as Baltimore City's criminal court, the State has not suggested that similar congestion existed or exists in the Circuit Court for Montgomery County. We conclude that the delay between June 11 and November 15 was due to governmental tardiness and neglect and must be weighed against the State.

Although the Supreme Court has indicated that delays necessitated by missing witnesses can be considered neutral, *Barker v. Wingo, supra,* 407 U. S. at 531, 92 S. Ct. at 2192, it may be that the additional delay, from January 3 to 23, 1974, caused by the State's principal investigator's military assignment (which might not have qualified him to be classified as a "missing witness") should also be assessed against the State. We say this not only because the State brought about the postponement of the trial until January 3, 1974, but also because, when, on December 4, 1973, the State requested the further continuance until January 23 to accommodate its witness, it could have asked that the trial

date be advanced rather than deferred. But even if the delay occasioned by the State's investigating officer being out of the country was considered neutral, we would still, in the light of the other circumstances, find a violation of the petitioner's constitutional right in this case.

### (3) Defendant's Assertion of His Right

It is not disputed that counsel for Smith asserted, repeatedly, his client's constitutional right to a speedy trial. Motions were first made orally on June 11, 1973, and renewed on November 7, December 4, and finally at trial in January of 1974. Moreover, as described more fully in the statement of facts, the State's Attorney's office was fully aware of the requests and cognizant of the trial court's interest in the speedy disposition of this case. These repeated demands must be weighed as supportive of the petitioner's position that he was denied a speedy trial.

### (4) Prejudice to the Defendant

The Supreme Court has stated that under the *Barker* guidelines an affirmative demonstration of prejudice by the defendant is not necessary in order to prove a violation of the Sixth Amendment speedy trial right. *Moore v. Arizona,* 414 U. S. 25, 26, 94 S. Ct. 188, 189, 38 L.Ed.2d 183 (1973). Thus even if we were to agree with the Court of Special Appeals' conclusion that petitioner did not establish that he was prejudiced, affirmance of that court's holding, that Smith was not denied his constitutional right, would not concomitantly follow. However, since we believe, after making an independent review of the evidence, that the petitioner was prejudiced by the delay, Smith has a stronger case for dismissal.

In *Barker* the Supreme Court said that "[p]rejudice . . . should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." 407 U. S. at 532, 92 S. Ct. at 2193. One such interest was to "prevent oppressive pretrial incarceration." *Id.* Smith was subjected to almost nine months of pretrial incarceration — from

September 16, 1972, to June 11, 1973. The speedy trial right was also intended to minimize the anxiety of the accused, his family and friends, and to protect the accused from public scorn, financial ruin and having to curtail his speech and associations. *Barker v. Wingo, supra*, 407 U. S. at 532-33, 92 S. Ct. at 2193; *United States v. Marion, supra*, 404 U. S. at 320, 92 S. Ct. at 463; *Klopfer v. North Carolina, supra*, 386 U. S. at 222, 87 S. Ct. at 993; *Epps v. State, supra*, 276 Md. at 118, 345 A. 2d at 76-77. Considering that there was a time-lapse of 16 months between Smith's arrest and trial, and that his family was forced onto the public welfare rolls during this period, we conclude that at least some of these considerations are applicable to this case. Lastly, the *Barker* Court said that the speedy trial right was intended "to limit the possibility that the defense will be impaired [by delay]," which interest the Court termed "the most serious . . . because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." 407 U. S. at 532, 92 S. Ct. at 2193. Smith asserts that his defense was, in fact, impaired by the delay from June 11 to November 15, 1972, because during that period his mental condition deteriorated to the point where he could no longer aid in his defense. The evidence relating to this contention was in conflict, with petitioner's psychiatrist, who had seen Smith frequently between November 12, 1972, and November 14, 1973, supporting petitioner's position while the State's medical expert concluded, after a one-hour examination, that Smith's mental health had improved and that he could assist in his defense. We are simply unable to conclude, particularly since the sanity of the petitioner was always at least colorably an issue, that no prejudice of this nature was shown. *Cf. Williams v. United States*, 250 F. 2d 19, 23 (D.C. Cir. 1957) (passage of time makes proof of subtle fact of mental state immeasurably difficult).

It must be remembered that societal interests, as well as those of the accused, are protected and effectuated by the state and federal speedy trial clauses. In fact, dilatoriness, at which the two speedy trial rights take aim, undermines the entire criminal justice system by: enabling defendants to

negotiate plea bargains more advantageous to themselves; increasing the opportunity of those free while awaiting trial to commit other crimes or to flee; reducing the capacity of the Government to prove its case; increasing the costs and overcrowding of penal facilities; and reducing the ability of the system to deter and rehabilitate. *Barker v. Wingo, supra,* 407 U. S. at 519-21, 92 S. Ct. at 2186-87; *Dickey v. Florida,* 398 U. S. 30, 42, 90 S. Ct. 1564, 1571, 26 L.Ed.2d 26 (1970) (Brennan, J., concurring). Additionally, by penalizing governmental delay intended to disadvantage a defendant, the speedy trial right discourages official abuse of the judicial system. *Id.* at 42-43, 90 S. Ct. at 1571. Thus, even though these constitutional provisions indicate that the right to a speedy trial adheres to the accused, broad societal concerns are also at stake whenever the issue is legitimately raised.

Having examined the facts of this case in relation to the four factors mentioned in *Barker,* and applying the "difficult and sensitive balancing process" mandated by that case, 407 U. S. at 533, 92 S. Ct. at 2193, we conclude that the petitioner was denied his constitutional right to a speedy trial as guaranteed by the Sixth Amendment of the Federal Constitution; similarly we hold that he was denied his Article 21 right. Since the Supreme Court has held that dismissal of the indictment is the only available remedy for a violation of the Sixth Amendment right to a speedy trial, *Strunk v. United States,* 412 U. S. 434, 440, 93 S. Ct. 2260, 2263, 37 L.Ed.2d 56 (1973), the indictment upon which Smith was convicted must be dismissed.

> *Judgment of the Court of Special Appeals reversed; case remanded to that court with directions that it be remanded to the Circuit Court for Montgomery County with instructions to dismiss the indictment; costs to be paid by Montgomery County.*

*O'Donnell, J., concurring:*

Although I agree with the conclusion reached by the majority that the appellant was denied the right to a speedy trial guaranteed him under both the Sixth Amendment and Article 21 of the Maryland Declaration of Rights, I cannot subscribe to the validity of some of the premises posited by the majority in reaching that result.

In *Epps v. State*, 276 Md. 96, 345 A. 2d 62 (1975), we recently examined the right to a speedy trial and those factors delineated by the Supreme Court in *Barker v. Wingo*, 407 U. S. 514 (1972) as applicable in determining whether that right has been denied. We there pointed out that "in *Klopfer v. North Carolina*, 386 U. S. 213, 223 (1967) [the Supreme Court] made clear . . . that the right [to a speedy trial] is 'as fundamental as any of the rights secured by the Sixth Amendment' and is imposed by the Due Process Clause of the Fourteenth Amendment on the States. *See Smith v. Hooey*, 393 U. S. 374 (1969)." 276 Md. at 102, 345 A. 2d at 68. Since the Supreme Court, by selective incorporation, has brought the right to a speedy trial guaranteed under the Sixth Amendment within the ambit of the Fourteenth Amendment and, as such, binding upon the States, decisions by that Court establish the minimal standards to be applied when there has been an assertion of the denial of a speedy trial.

Notwithstanding my recognition of the protections afforded through our own Declaration of Rights, as I see it, the provisions of the Sixth Amendment and of our Article 21, each providing as they do for the right to a speedy trial in all criminal cases, are *in pari materia*, and in interpretation and application should be harmonized. It seems to me outmoded to suggest "that the opinions of the Supreme Court interpreting the sixth amendment right to a speedy trial are 'very persuasive, although not necessarily controlling' as to the proper construction of Maryland's parallel Article 21 right." In *Epps* we recognized that the decisions of the Supreme Court in interpreting the Sixth Amendment right to a speedy trial were clearly controlling, even to the extent of the remedy mandated by that Court's

decisions — the dismissal of the indictment where the right has been denied. 276 Md. at 121, 345 A. 2d at 78. As I read the provisions in Maryland Code (1957, 1971 Repl. Vol. [1975 Cum. Supp.]) Art. 27, § 645A (a), (d) (Post Conviction Procedure Act), as well as those in 28 U.S.C. § 2254 (Habeas corpus remedies in Federal courts in cases of state custody), the decisions of the Supreme Court would be held "controlling" and not merely "very persuasive" in a collateral attack upon a state criminal conviction.

I believe it equally anachronistic to suggest a continuation of the categorizations designated in 1915 by the late Judge Alfred S. Niles in his recognized treatise on Maryland *Constitutional Law,* in view of the application by the Supreme Court, since that date, of specific rights guaranteed under the First, Fourth, Fifth, Sixth, Eighth and Ninth Amendments to the United States Constitution, as binding upon the States pursuant to the "due process" clause of the Fourteenth Amendment.

Because of the view adopted by the majority concerning the noncontrolling effect of the decisions of the Supreme Court in the area of a speedy trial, they seem to suggest the view (in footnote 2) that in Maryland the demand-waiver doctrine, which requires a holding that a defendant waived his right to a speedy trial if he failed to demand it, may still be of continuing force and effect. The majority thus suggests that our prior holdings in *State v. Murdock,* 235 Md. 116, 123, 200 A. 2d 666, 669-70, *cert. denied,* 379 U. S. 914 (1964) and in *Harris v. State,* 194 Md. 288, 297, 71 A. 2d 36, 40 (1950), both antedating *Barker v. Wingo,* may still have viability. We pointed out in *Epps* that in *Barker v. Wingo,* the Supreme Court had specifically rejected the demand-waiver doctrine, as a criterion for invocation of the right to a speedy trial, but recognized that the defendant's assertion of his right, or his failure to do so, was but one of the factors to be considered in applying the right guaranteed by the sixth amendment. As a result of the decision in *Barker v. Wingo,* it appears to be no longer open to question that the demand-waiver doctrine heretofore applied by this Court in *State v. Murdock, supra,* and in *Harris v. State,*

*supra,* has been repudiated and that such a demand is no longer a condition precedent to the application of the right. Such a view was recognized not only in *Epps,* but in *State v. Hunter,* 16 Md. App. 306, 314-15, 295 A. 2d 779, 783 (1972) and in *State v. Jones,* 18 Md. App. 11, 16-18, 305 A. 2d 177, 180-81 (1973).

I think further that the majority should have made it clear that the interval between October 6, 1972, when the defendant filed a plea of not guilty by reason of insanity and was thereupon committed to Perkins State Hospital for examination, pursuant to Maryland Code (1957, 1972 Repl. Vol.) Art. 59, § 23, until the receipt of the Hospital's report by the trial judge on December 12, 1972, should not be considered in computing any delay in bringing the defendant to trial. *See Baldwin v. Warden,* 243 Md. 326, 328-39, 243 A. 2d 73, 75 (1966) where this Court recognized that a substantial portion of the time between the appellant's indictment, and the date of his trial, was spent "in examining [him] in relation to his plea of not guilty by reason of insanity" and was not at all unreasonable under the circumstances of the case. Although the majority finds that the "crucial delay occurred between the original trial date of June 11, 1973, and November 15, 1973, the date on which the trial was first rescheduled to begin," and do not address themselves to the interval while Smith was a patient in Perkins Hospital, they implicitly suggest that such an interval might be includable within the computation of the period, when they point out "that employees of a court's assignment office, or *of a state hospital,* as well as prosecutors, policemen and judges must be considered representatives of the state" (emphasis added) in appraising reasons for any delay.

Art. 59, § 23, as did its predecessor, Code (1957, 1964 Repl. Vol.) Art. 59, § 7, prescribes a rule of procedure by which to ascertain, before trial, whether or not a defendant, charged with a criminal offense, possessed the requisite mental capacity to commit the offense with which he is charged, as well as to determine his competency to assist in his defense. *See Hamilton v. State,* 225 Md. 302, 170 A. 2d 192 (1961). It is

the purpose of the provisions of Art. 59 to protect an offender who is mentally incapable of forming a criminal intent, from being punished as if he were sane, and to insure for him, in the event of a finding of insanity, custody and treatment. *Robinson v. State,* 249 Md. 200, 238 A. 2d 875 (1968). When Smith raised the issue of his mental competency, it became incumbent upon the trial court to determine whether or not there should be a trial on the issue of his criminal culpability. *See Hamilton v. State, supra.* His commitment to Perkins Hospital, upon the plea filed by him pursuant to the statute, provided the means to have a diagnosis made on the question of his insanity. *Tull v. State,* 230 Md. 596, 188 A. 2d 150 (1963).

The Supreme Court recognized in *United States v. Ewell,* 383 U. S. 116, 120 (1966), that "because of the many procedural safeguards provided an accused, the ordinary procedures for criminal prosecution are designed to move at a deliberate pace." In *Epps,* we recognized that "[f]or 'speedy trial' purposes the delay involved is reckoned only in connection with 'the passage of time beyond that which is obviously within the requirements of orderly procedure'" citing *State v. Lawless,* 13 Md. App. 220, 230, 283 A. 2d 160, 169 (1972). Smith's confinement at Perkins Hospital, in an attempt to establish his pleaded defense, could certainly be said to come within the scope of "orderly procedure" prior to the scheduling of his trial. Since his commitment was at his own behest, the computation of time affecting his right to a speedy trial should be held in abeyance pending receipt of the hospital's report to the trial court, pursuant to Art. 59, § 24 (a) as to whether or not he was competent to stand trial. This view seems to be in accord with that expressed in *United States v. Canty,* 469 F. 2d 114, 118 (D.C. Cir. 1972) and *State v. Smith,* 215 Kan. 34, 40, 523 P. 2d 691, 696 (1974). It would be unnecessarily burdensome during that interval to require the prosecution to prepare for a trial which might never occur were he found to lack the mental capacity to have committed the crimes charged.

Though I agree with the view of the majority that "if the petitioner's trial had taken place within a few days of June

11, it might well have been acceptable," I think it should be clearly explicated that any computation of a delay in bringing the petitioner to trial commenced only upon the receipt by the trial court of the hospital's report.

Lastly, I am unable to agree with the majority's conclusion that the delay between June 11 and November 15, 1973, while unforgivable for speedy trial purposes in Montgomery County, might be acceptable in Baltimore City. They express the view: "although the delay in this case might have been understandable, and possibly even acceptable, in an extremely congested court such as Baltimore City's criminal court, the State has not suggested that similar congestion existed or exists in the Circuit Court for Montgomery County." Although the record is devoid of whatever reason there may have been for the delay between June 11th (when the trial judge indicated a continuance restricted to 30 days) and the rescheduling, on July 20, 1973, by the assignment office, of the trial for November 15th, the majority seems to be taking judicial notice of a difference in the status of the criminal trial dockets between Montgomery County and Baltimore City. Upon such an unsupported premise they seem to suggest a differing application of constitutional principles between subdivisions within the State. In *Epps*, it was held that the delay in affording a criminal defendant a "speedy trial" because of overcrowded court dockets and scheduling problems in Baltimore City, was not excusable. Concluding that the responsibility for affording a defendant a speedy trial rests upon both the courts and the prosecutors, we there found that if a defendant's rights to a speedy trial are being infringed, the courts, as well as the assignment offices acting as their agencies, together with the prosecutors, have the duty to promptly assign a defendant's case for trial. As pointed out in *Barker v. Wingo, supra*, and in *Strunk v. United States*, 412 U. S. 434 (1973), although "[u]nintentional delays caused by overcrowded court dockets or understaffed prosecutors are among the factors to be weighed less heavily than intentional delay," they must "be considered since the ultimate responsibility for such circumstances must rest

with the government rather than with the defendant." 412 U. S. at 436. As I see it, when a defendant makes demand for a speedy trial, he must be afforded such a trial within a reasonably prompt period of time, notwithstanding that the assignment of his case for trial may involve some rescheduling and reshuffling of other cases upon the criminal trial dockets.

Assuming that Smith's case was not more promptly rescheduled for trial after June 11th because of a lack of communication between the trial court and the court's assignment office, or the prosecutor and that office, or from clerical inefficiencies, if the delay was of constitutional dimension in Montgomery County, it should be treated as having equal constitutional significance throughout the State without regard to the status of the docket. Fully appreciating that there may be realistic reasons, factually supportable, for delay in the trial of a defendant, which might vary within subdivisions of the State, the application of the constitutional principles concerning the denial of the right to a speedy trial should be consistent.