STATE OF MARYLAND *v.* ROBERT MICHAEL WILSON

[No. 1366, September Term, 1975.]

*Decided March 8, 1977.*

112

The cause are argued before GILBERT, C. J., and MOYLAN, DAVIDSON and LOWE, JJ.

*Albert Gallatin Warfield, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Thomas Hickman, State's Attorney for Carroll County,* on the brief, for appellant.

*Orrin J. Brown, III, Assigned Public Defender,* for appellee.

MOYLAN, J., delivered the opinion of the Court.

What is the denial of the right to a speedy trial? As Professor Anthony G. Amsterdam, a recognized champion of defendants' rights, has pointed out,[1] it is not one thing but many things. What represents an inordinate delay within the contemplation of the Sixth Amendment, therefore, depends upon precisely what it is that the defendant seeks when he asserts a "speedy trial" claim. It is one thing when he demands, "I have a right to a speedy trial; therefore, try me immediately." It is yet another when he demands, "I have a right to a speedy trial; therefore, release me upon my

---

* Note: *Certiorari* granted, Court of Appeals of Maryland, June 1, 1977.

1. Before the joint meeting of the Appellate Judges Conference and the National Conference of State Trial Judges in San Francisco, on August 12, 1972.

recognizance if you do not intend to give me an immediate trial." It is yet something else again when he demands, "I had a right to a speedy trial; therefore, dismiss forever all charges against me." In view of what is at stake, it makes all the difference in the world to discover that end which a defendant is seeking to attain. The request, "Try me today!," is a far cry from that other request, "Try me never, because you did not try me yesterday!" As Professor Amsterdam points out:

> ". . . [T]here is not one speedy trial right, there are many speedy trial rights, and . . . in asking whether or not the right to a speedy trial has been denied, the old law professor's question 'For what purpose?' is all important.
>
> . . . I think the test for when a trial is too long delayed for Sixth Amendment purposes is one thing where a defendant is asking for a trial. There it will be very brief indeed and he may have a right to a very quick trial. It may be shorter, if what he is asking for is release from confinement pending trial. It will be somewhat longer, where what he is asking for is the right to have the charges dismissed without prejudice and it might be quite long, indeed, before he is entitled to dismissal of the charges with prejudice."

There is a gaping disparity between ordering an immediate trial, releasing upon bail or recognizance, and dismissing with ultimate prejudice society's accusation of outlawry. The values invigorating the Sixth Amendment are vitally engaged when an accused seeks expeditious resolution of the charges against him; those values are sometimes shamelessly exploited when an accused waits to turn to the Sixth Amendment for the first time in order *to avoid* that resolution of the charges against him. In making a reflective and independent constitutional judgment, we will not be indifferent to the way in which and the purpose for which one seeks to use the law.

In dealing with the dismissal of an indictment because of a denial of the right to a speedy trial, appellate courts are not engaged in abstract, academic exercises. They cannot ignore the stark reality of the heavy and foreclosing sanction employed. It is no mere exclusion of evidence, which permits society to try again to prove its accusation with other and untainted evidence. It is no mere reversal of a conviction, which permits society to try again to prevail at a trial free from error. It is the final judgment that society is forever powerless to proceed against a potentially dangerous outlaw in its midst. It is the severity and finality of the sanction that must give us pause in applying it. As the Supreme Court pointed out in *Barker v. Wingo*, 407 U. S. 514, 522, 92 S. Ct. 2182, 33 L.Ed.2d 101, 112 (1972):

> "The amorphous quality of the right also leads to the unsatisfactorily severe remedy of dismissal of the indictment when the right has been deprived. This is indeed a serious consequence because it means that a defendant who may be guilty of a serious crime will go free, without having been tried. Such a remedy is more serious than an exclusionary rule or a reversal for a new trial, but it is the only possible remedy."

That philosophical imperative of *Barker v. Wingo*, which case is the star by which we steer, found expression by us in *State v. Jones*, 18 Md. App. 11, 14-15, 305 A. 2d 177, 179:

> "To dismiss, with prejudice, an indictment for armed robbery, because a defendant claims he was denied a speedy trial, is a severe sanction. It is the final denial of organized society's right to bring an accused transgressor before the bar of justice. In the face of vexing delays, lesser remedies may well commend themselves: the State may be put to the extraordinary burden of proceeding to trial on short or well-nigh immediate notice; a defendant's request for pretrial release, on bail or recognizance, may take on additional merit. To say, however, that

the people, because they have not yet successfully retooled an overtaxed and obsolescent system to meet the demands of a computerized age, must forfeit forever the right to proceed against an accused felon, is an extreme and ultimate step to be taken only for the weightiest of reasons. The words of Justice Cardozo are pertinent, 'Justice, though due to the accused, is due to the accuser also.... We are to keep the balance true.' [2] "

In *State v. Dubose*, 17 Md. App. 292, 300, 301 A. 2d 32, 36, former Chief Judge Orth (now Associate Judge of the Court of Appeals) incisively recognized the attitude of caution and forebearance with which courts must approach this problem, because the application of so extreme a sanction would "preclude the rights of public justice, because it meant that [the defendant], charged with a serious crime, went free without being tried." We reaffirm what we said in *McIntyre v. State*, 17 Md. App. 526, 534, 302 A. 2d 672, 677:

"The law does not lightly wield a sanction so ultimately destructive of society's fundamental right to have transgressors stand before the bar of justice upon the merits of the cause."

It is, of course, the Federal Constitution which is here involved. The supreme expositor of that Constitution is the Supreme Court of the United States. The recent, and the most probing, examination of both the letter and the undergirding spirit of the constitutional provision is found in *Barker v. Wingo*.[3] That case is the touchstone to which we shall return and return and return again in testing the facts

---

2. *Snyder v. Massachusetts*, 291 U. S. 97, 54 S. Ct. 330, 78 L. Ed. 674 (1934).

3. On three more recent occasions, the Supreme Court has had occasion to deal with the right to a speedy trial in *Strunk v. United States*, 412 U. S. 434, 93 S. Ct. 2260, 37 L.Ed.2d 56 (1973); *Moore v. Arizona*, 414 U. S. 25, 94 S. Ct. 188, 38 L.Ed.2d 183 (1973); and *Dillingham v. United States*, 423 U. S. 64, 96 S. Ct. 303, 46 L.Ed.2d 205 (1975). All are rather summary applications of the principles enunciated in *Barker v. Wingo* and none derogates from the status of *Barker v. Wingo* as the ultimate repository of Sixth Amendment wisdom.

at hand against its informing standards. From that jurisprudential point of departure, we move to the consideration of the case at hand.

\* \* \*

The appellee, Robert Michael Wilson, was arrested by Maryland State Police in Carroll County on May 26, 1971. The Sixth Amendment clock began ticking on that day. The appellee filed, in the Circuit Court of Carroll County, a motion to dismiss the pending indictments because of a denial of his right to a speedy trial on July 11, 1975. The hearing on that motion commenced on July 22, 1975. The Sixth Amendment clock stopped ticking on that day. It had registered 1,518 days. Fifty months. Four years and two months. That is a very long time. Standing alone, however, four years and two months tells us absolutely nothing. We need to know what happened in those four years and two months.

After the hearing on the motion was concluded on July 23, 1975, and the submission of memoranda by both the appellee and the State, the hearing judge asked for reargument on October 16 in light of the then recently promulgated case of *Epps v. State*, 276 Md. 96, 345 A. 2d 62. On October 30, 1975, the hearing judge ruled that the appellee had been denied his constitutional right to a speedy trial. The motion to dismiss the indictments was granted. The State has filed a timely appeal from that order of the court.

We are guided by a case law so massive that, in terms of guidance, it has long since passed the point of diminishing returns. That case law bearing directly upon the State of Maryland consists of 13 decisions of the Supreme Court of the United States, 29 decisions of the Court of Appeals of Maryland, and 98 reported decisions of the Court of Special Appeals of Maryland.[4] In the last analysis, however, the be-all and end-all of necessary wisdom is *Barker v. Wingo*.

---

4. All of those decisions of all three courts that had been handed down as of July 1, 1973, are collected, analyzed and hopefully synthesized in the

At the very threshold of analysis, *Barker v. Wingo* demonstrates, by its example as well as by its language, that the initial shock wave of reading the bottom line on the time register may not, *ipso facto*, dispose of a question which involves the intricate interplay of that and many other variables. The Sixth Amendment clock in that case registered 1,907 days. Sixty-three months. Five years and three months. That also is a very long time. Indeed, an even longer time than that now before us. Notwithstanding that very long time, the Supreme Court held that *the Sixth Amendment right to a speedy trial had not been denied*. The yardstick alone will not do.

## The Four-Factor Balancing Test

It is axiomatic, from all of the massive case law upon the subject, that the mere running of the calendar will not be viewed in isolation and has little significance divorced from the questions of reason for delay and prejudice, which are, respectively, its cause and its effect. The Supreme Court has explicitly rejected "the inflexible approach ... — the fixed-time period because it goes further than the

combination of *State v. Jones*, 18 Md. App. 11, 305 A. 2d 177, and *State v. Lawless*, 13 Md. App. 220, 283 A. 2d 160. Since the *Jones* decision, the Supreme Court has handed down the additional cases of *Strunk v. United States*, 412 U. S. 434, 93 S. Ct. 2260, 37 L.Ed.2d 56 (1973); *Moore v. Arizona*, 414 U. S. 25, 94 S. Ct. 188, 38 L.Ed.2d 183 (1973); and *Dillingham v. United States*, 423 U. S. 64, 96 S. Ct. 303, 46 L.Ed.2d 205 (1975). The Court of Appeals has handed down the additional cases of *Epps v. State*, 276 Md. 96, 345 A. 2d 62; *Smith v. State*, 276 Md. 521, 350 A. 2d 628; *Erbe v. State*, 276 Md. 541, 350 A. 2d 640; and *Jones v. State*, 279 Md. 1, 367 A. 2d 1. This Court has handed down additional decisions in the cases of *Davidson v. State*, 18 Md. App. 61, 305 A. 2d 474; *Pennington v. State*, 19 Md. App. 253, 310 A. 2d 817; *Bell v. State*, 22 Md. App. 496, 323 A. 2d 677; *Matthews v. State*, 23 Md. App. 59, 325 A. 2d 897; *Powell v. State*, 23 Md. App. 666, 329 A. 2d 413; *Jordan v. State*, 24 Md. App. 267, 330 A. 2d 496; *State v. Becker*, 24 Md. App. 549, 332 A. 2d 272; *Erbe v. State*, 25 Md. App. 375, 336 A. 2d 129; *State v. Wynn*, 26 Md. App. 39, 336 A. 2d 800; *Todd and Merryman v. State*, 26 Md. App. 583, 338 A. 2d 350; *Jones v. State*, 29 Md. App. 182, 348 A. 2d 55; *Ward v. State*, 30 Md. App. 113, 351 A. 2d 452; *Evans v. State*, 30 Md. App. 423, 352 A. 2d 343; *Daniels v. State*, 30 Md. App. 432, 352 A. 2d 859; *State v. Smith*, 31 Md. App. 328, 356 A. 2d 328; *Isaacs v. State*, 31 Md. App. 604, 358 A. 2d 273; *Davis v. State*, 32 Md. App. 318, 360 A. 2d 467; *Lee v. State*, 32 Md. App. 671, 363 A. 2d 542; *Grandison v. State*, 32 Md. App. 705, 363 A. 2d 523; *Pyle v. State*, 34 Md. App. 60, 366 A. 2d 90; *Wilson and Green v. State*, 34 Md. App. 294, 367 A. 2d 970; *Dorsey v. State*, 34 Md. App. 525, 368 A. 2d 1036 (1976); and *Sewell v. State*, 34 Md. App. 691, 368 A. 2d 1111 (1976).

Constitution requires." *Barker v. Wingo,* at 407 U. S. 529. *Barker v. Wingo,* rather, mandates a balancing test:

> "The approach we accept is a balancing test, in which the conduct of both the prosecution and the defendant are weighed.
>
> A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 U. S. at 530.

### The Threshold Question of "Constitutional Dimension"

The mere assertion of a Sixth Amendment claim on the part of a defendant will not, *ipso facto,* require courts, trial or appellate, to undertake this multi-faceted and involved analysis. There is "a triggering mechanism." *Barker v. Wingo,* at 407 U. S. 530. This is that quantum of elapsed time between the institution of criminal proceedings and the ultimate trial (or the hearing on the speedy trial denial claim) which we have labeled as delay of "constitutional dimension."

This threshold question in considering speedy trial claims is that of whether there has been any true "delay" in the constitutional sense. If, upon preliminary examination, we may determine that there has been no "delay" of "constitutional dimension" — if the claim of "speedy trial" denial is clearly frivolous — if the passage of time is patently not inordinate — we are relieved of all necessity to make further analysis. If this threshold of "constitutional dimension" has not been crossed, there is no need for the delicate weighing of social values in order "to balance the right of the individual to obtain a speedy trial against the

right of society to punish those who are properly shown to have committed a crime against it." [5] There is no need to look to the subtle interaction of the four factors: (1) length of delay, (2) reason for delay, (3) prejudice to the accused, and (4) assertion of the right by the accused. *State v. Lawless*, 13 Md. App. 220, 229-232, 283 A. 2d 160; *State v. Jones*, 18 Md. App. 11, 22-23, 305 A. 2d 177.[6] As *Barker v. Wingo* articulated it, "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." 407 U. S. at 530.

When we use the word "delay" in this sense, we are not reading into the word any value judgments.[7] All subjective considerations such as fault and prejudice will be deferred until we move on to the evaluation of the final three of the four interrelated factors. Here at the threshold, we are not dealing with the questions of what parts of the "delay" will be attributed to the State or to the defendant or to neutral circumstances. Such questions will have their day if and when analysis is triggered and when we come to the "reason" factor in the course of that analysis.

---

5. *Barnett v. State*, 8 Md. App. 35, 38-39, 257 A. 2d 466.

6. The notion of "constitutional dimension," analyzed in *State v. Lawless* and *State v. Jones*, emerged from a series of earlier cases by this Court: *Fabian v. State*, 3 Md. App. 270, 286, 239 A. 2d 100; *King v. State*, 5 Md. App. 652, 666, 249 A. 2d 468; *Greathouse v. State*, 5 Md. App. 675, 685, 249 A. 2d 207; *Jones v. State*, 10 Md. App. 420, 428, 270 A. 2d 827; and *Brown v. State*, 10 Md. App. 462, 466, 271 A. 2d 182.

7. We wish to make it clear that in computing the delay to determine whether it is of "constitutional dimension," we reckon the *entire* lapse of time between the institution of criminal proceedings and the trial or "speedy trial" claim hearing. See *Jones v. State*, 279 Md. 1, 367 A. 2d 1; *Smith v. State*, 276 Md. 521, 350 A. 2d 628; *Epps v. State*, 276 Md. 96, 345 A. 2d 62; *Dorsey v. State*, 34 Md. App. 525, 368 A. 2d 1036 (1976); *Lee v. State*, 32 Md. App. 671, 363 A. 2d 542; *Ward v. State*, 30 Md. App. 113, 351 A. 2d 452; *State v. Becker*, 24 Md. App. 549, 332 A. 2d 272; *State v. Hunter*, 16 Md. App. 306, 295 A. 2d 779; *Thompson v. State*, 15 Md. App. 335, 290 A. 2d 565. To the extent to which we said in *State v. Lawless*, at 13 Md. App. 230, that we reckoned only "that passage of time fairly attributable to the State" and not excused by the "orderly administration of justice," we had the cart before the horse and that aspect of *Lawless* is no longer controlling. It is axiomatic that we cannot, on this threshold question, subject to qualitative analysis the very device which is the possible trigger for such analysis. We cannot scrutinize before we have determined whether to scrutinize.

Within the watertight compartment of the trigger mechanism, it is enough to record the cold and neutral arithmetic computation that between the institution of the criminal proceedings and the hearing on the Sixth Amendment claim, there elapsed a time period of four years, one month and twenty-six days. That delay is self-evidently of "constitutional dimension." [8] It is so, many times over. Further analysis is manifestly triggered.

### The Length of Delay

"Delay" within the contemplation of *Barker v. Wingo* is a hybrid. It is both the mechanism which triggers analysis and then a factor in that analysis which it has triggered. It straddles the line between the decision to analyze and the analysis itself. Although it means nothing standing alone, it is clear, however, that it is a factor in the final analysis upon the merits and not simply the triggering mechanism. All else being equal on the questions of reason for delay, demand-waiver and prejudice, a delay which has just barely crossed the threshold requiring analysis in the first place might well tip the scales toward a holding that the Sixth Amendment right to a speedy trial has not been denied, whereas, with the other three factors or values remaining constant, a delay measured in many years or even decades might well tip the scales in the opposite direction.

Even in looking at the naked delay factor, divorced from its interplay with reason for delay or prejudice or

---

**8.** Representative of the holdings of both the Court of Appeals and of this Court to the effect that a delay was of "constitutional dimension" so as to trigger further analysis are the cases of *Ward v. State,* 30 Md. App. 113, 351 A. 2d 452 (33 months); *Jones v. State,* 279 Md. 1, 367 A. 2d 1 (29 months); *Lee v. State,* 32 Md. App. 671, 363 A. 2d 542 (19 months); *Smith v. State,* 276 Md. 521, 350 A. 2d 628 (16 months); *Epps v. State,* 276 Md. 96, 345 A. 2d 62 (12 1/2 months); *Dorsey v. State,* 34 Md. App. 525, 368 A. 2d 1036 (1976) (11 months); and *State v. Becker,* 24 Md. App. 549, 332 A. 2d 272 (9 1/2 months). Representative cases holding that delays were not of "constitutional dimension" are *State v. Hunter,* 16 Md. App. 306, 295 A. 2d 779 (5 1/2 months), and *Thompson v. State,* 15 Md. App. 335, 290 A. 2d 565 (5 1/2 months). All of these cases properly reckoned the entire passage of time between the institution of criminal proceedings and the trial or "speedy trial" claim hearing.

demand-waiver, the arithmetic computation is not viewed in a vacuum. As *Barker v. Wingo* pointed out, at 407 U. S. 530-531:

> "[T]he length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case. To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge."

When it is viewed alone, there is not a great deal that can be said about the delay factor. The arithmetic yields a sum of four years, one month and twenty-six days. That arithmetic is written on a slate consisting of six indictments, five of them charging assault with intent to murder (five Maryland State troopers respectively) and one of them charging common law burglary. The analysis of this factor has now proceeded as far as it can ever go. Although it will have an indubitable bearing upon the other factors, it, standing alone, tells us absolutely nothing about the correct resolution of the Sixth Amendment claim. We must, therefore, move on to other factors — to the distinct questions of why did it happen, who was responsible for the happening and what effect the happening may have had upon the defendant and/or his defense.

## Prejudice

We choose, for better coherence in structuring this particular analysis, to consider next the factor of prejudice.

### 1. *The Burden of Persuasion on the Question of Prejudice*

Within the limited context of this prejudice factor, there is a procedural issue which must be resolved before considering the substantive question of prejudice. The issue, in a nutshell, is, "Who has the burden of proof?" Must a defendant affirmatively show prejudice? Must the State show nonprejudice? Does the burden at a certain point shift from the defendant to the State? Who prevails if neither side shows anything? It is now clear that the evidentiary device

developed and utilized by this Court to resolve this issue must be modified in the light of *Barker v. Wingo*.

Traditionally, three approaches had been used to arrive at a determination of prejudice.[9] One of those approaches was that it was always incumbent upon the accused to make a showing of actual prejudice [10] or at least a strong possibility of prejudice resulting to him or to his defense from the delay. Another of the traditional approaches was that prejudice would be conclusively presumed and necessarily followed from long delay.[11] The middle position was that a certain quantitative and qualitative delay would give rise to a rebuttable presumption of prejudice and would shift the burden of going forward with the evidence from the accused to the State. Before that critical point was reached, there rested upon the accused, as the moving party, the burden of persuading the hearing judge that the accused had suffered prejudice. Once that critical point had been reached, however, the presumption of prejudice arose and the burden of going forward with the evidence shifted to the State. That critical point on the delay scale where the presumption arose and where the burden shifted had been denominated the point of "substantial" delay.

As early as *Stevenson v. State*, 4 Md. App. 1, 241 A. 2d 174, with Judge Orth speaking for this Court, we opted for that middle position. That notion of "substantial" delay as a presumption-generating trigger mechanism had been taken from *Williams v. United States*, 250 F. 2d 19, 21-22 (D.C. Cir. 1957); *United States v. Banks*, 370 F. 2d 141, 144-145 (4th Cir. 1966); and *Bond v. United States*, 233 A. 2d 506, 512 (D.C. App. 1967). We resorted to it frequently in early cases. *Frazier v. State*, 5 Md. App. 88, 92-93, 245 A. 2d 614; *King v. State*, 6 Md. App. 413, 418, 251 A. 2d 628; *Wilson v. State*, 8 Md. App. 299, 306, 259 A. 2d 553; and *Caesar v. State*, 10 Md.

---

**9.** Note, *The Lagging Right to a Speedy Trial*, 51 Va. L. Rev. 1587, 1591-1592 (1965).

**10.** *United States ex rel. Von Cseh v. Fay*, 313 F. 2d 620, 624 (2d Cir. 1963).

**11.** *Petition of Provoo*, 17 F.R.D. 183, 198, 203 (D. Md. 1955) (alternative holding); *United States v. Chase*, 135 F. Supp. 230, 233 (N.D. Ill. 1955).

App. 40, 43, 267 A. 2d 750. We analyzed this second trigger mechanism — distinct from the earlier trigger mechanism of "constitutional dimension" — at great length in *State v. Lawless,* at 13 Md. App. 232-237, and *State v. Jones,* at 18 Md. App. 27-29. We capsulized it in *McIntyre v. State,* at 17 Md. App. 531:

> "The initial question here is, 'Who has the burden of proof?' The rule is that if the delay is 'substantial,' a presumption of prejudice is generated, with an attendant burden upon the State to rebut the presumption. On the other hand, if the delay is less than 'substantial,' the presumption is not triggered and the burden of showing prejudice falls upon the accused."

Our case law was inevitably complicated by the presence of two distinct trigger mechanisms. As utilized by us, the trigger mechanism of "constitutional dimension" — that which would precipitate the very analysis of the Sixth Amendment claim itself — was situated at a somewhat earlier point along the time continuum.[12] The second trigger mechanism of "substantial" delay — that which would precipitate the presumption of prejudice — was situated at a significantly later point along the time continuum.[13] Inevitably, there arose occasions when the two triggers got confused.

The clear command of *Barker v. Wingo* has significantly simplified analysis in this regard. Under those constitutional guidelines, the presumption of prejudice arises at the very instant when review itself is necessitated. What had, in our prior case law, been two separate procedural and evidentiary devices are now united in a

---

12. See note 6 and note 7 *supra.*

13. See, for example, *Stevenson v. State,* 4 Md. App. 1, 241 A. 2d 174; *Brown v. State,* 4 Md. App. 141, 241 A. 2d 901; *Johnson v. State,* 4 Md. App. 648, 244 A. 2d 632; *Frazier v. State,* 5 Md. App. 88, 245 A. 2d 614; *State v. Williams,* 6 Md. App. 5, 249 A. 2d 503; *King v. State,* 6 Md. App. 413, 251 A. 2d 628; *Graham v. State,* 6 Md. App. 458, 251 A. 2d 616; *Barnett v. State,* 8 Md. App. 35, 257 A. 2d 466; *Wilson v. State,* 8 Md. App. 299, 259 A. 2d 553; *Caesar v. State,* 10 Md. App. 40, 267 A. 2d 750; and *Britton v. State,* 10 Md. App. 70, 267 A. 2d 747.

single and simultaneous generating mechanism. The very necessity for the Sixth Amendment analysis and the presumption of prejudice within that analysis are triggered together:

> "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." 407 U. S. at 530.

Whenever, therefore, the length of delay shall be deemed to be of "constitutional dimension," (1) the four-factor balancing test under *Barker v. Wingo* will be required and (2) prejudice will be presumed. The very notion of "substantial delay," as a distinct mechanism, has served its day and will pass from our case law. The two are now one. At least, they are two-in-one.

## 2. *The Utility of the Presumption of Prejudice*

Because prejudice is not a self-contained condition of any legal significance in and of itself but simply a participating factor in a far more involved calculus, it is in the interests of a defendant's claim to make this factor as weighty as possible and not simply legally sufficient. Many a defendant will, therefore, not rest upon the presumption but will, when he can, seek to establish prejudice by affirmative evidence. Having the benefit of the presumption, he is not required to do anything in this regard. He may, nonetheless, hazard the tactical judgment that in the mind of a particular constitutional fact finder, established prejudice may weigh more heavily than an abstract presumption. Thus, many a defendant will choose to demonstrate that he has suffered prolonged incarceration pending trial, that he has sustained fears and anxieties, that he has lost employment or that his defense upon the merits has been jeopardized.

Concomitantly, the presumption of prejudice is not conclusive but rebuttable. The State, for its part, may come forward and meet its burden of producing evidence and negate the presumed prejudice. It may show the absence of oppressive incarceration, the absence of injury to the

defense upon the merits, etc. When both sides have litigated the prejudice issue thoroughly, the presumption, powerful enough in an evidentiary vacuum, loses much of its significance. Its utility is primarily to allocate the burden of proof upon the issue of prejudice and to serve as a tie-breaker. *Barker v. Wingo* is strongly illustrative of this proposition. Its analysis was triggered by a delay of five years and three months, which the Supreme Court held was "presumptively prejudicial." Notwithstanding the presumption with which the analysis began, the ultimate conclusion was "that prejudice was minimal" and that there was an "absence of serious prejudice":

> "Two counterbalancing factors, however, outweigh these deficiencies. The first is that *prejudice was minimal.* Of course, Barker was prejudiced to some extent by living for over four years under a cloud of suspicion and anxiety. Moreover, although he was released on bond for most of the period, he did spend 10 months in jail before trial. But there is no claim that any of Barker's witnesses died or otherwise became unavailable owing to the delay. The trial transcript indicates only two very minor lapses of memory — one on the part of a prosecution witness — which were in no way significant to the outcome.
>
> More important than *the absence of serious prejudice*, is the fact that Barker did not want a speedy trial." 407 U. S. at 534. (Emphasis supplied)

### 3. *Prejudice, Presumptive or Proved, is But One of the Interrelated Factors*

It is a truism, but one that perhaps needs stating, that neither presumptive prejudice nor established prejudice is alone dispositive of the speedy trial denial claim. If it were otherwise, whenever analysis would be required, the defendant would always prevail upon the merits, for by the very terms of *Barker v. Wingo*, "there is no necessity for inquiry into the other factors that go into the balance" until

"there is some delay which is presumptively prejudicial." 407 U. S. at 530. A hasty survey of the speedy trial field makes it apparent that there are many cases where the delay has been sufficient to be "presumptively prejudicial" and to require the four-factor analysis and where the product of that analysis has been the conclusion that the right to a speedy trial had *not* been denied.

Clearly, even the establishment of great prejudice is not dispositive of the larger issue. Even if a defendant were to lose his job, his family and his good name and reputation while awaiting trial; even if that particularly sensitive defendant were totally to lose his psychological and psychiatric balance during the course of the ordeal; and even if his solidly material defense witnesses were to die or disappear in the interim, there would patently be no denial of the right to a speedy trial if the length of delay between arrest and trial had been but a week or two, notwithstanding the overpowering prejudice. Indeed, analysis of the claim upon its merits would not even have been triggered. Nor would such an overwhelming demonstration of prejudice establish the denial of the constitutional right even in the case of a much longer delay, if the evidence established that the delay had been caused not by the State but by the defendant. Prejudice, even massive prejudice, is but one of the interrelated factors. As *Barker v. Wingo* said in this regard:

> "We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." 407 U. S. at 533.

### 4. *The Varieties of Prejudice*

As we proceed to our analysis of the prejudice factor in

this case, we note that prejudice assumes several forms. There may be:

A. PREJUDICE TO THE PERSON, BY WAY OF
 1. OPPRESSIVE PRETRIAL INCARCERA-
 TION, AND/OR
 2. ANXIETY AND CONCERN.
B. PREJUDICE TO THE DEFENSE.

In this regard, *Barker v. Wingo* summed up the varieties of prejudice:

> "A fourth factor is prejudice to the defendant. Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." 407 U. S. at 532.

We note, moreover, as we approach the analysis in this case that we begin with prejudice being presumed. We need not rely totally upon that presumption, however, for a great deal of hard evidence upon the issue has found its way into the case from both the defense and the State.

### a. *Prejudice to the Person by Way of Oppressive Pretrial Incarceration*

*Barker v. Wingo* described the impact of undue pretrial incarceration inflicted upon a defendant by virtue of undue delay in bringing him to trial:

> "[T]he disadvantages for the accused who cannot obtain his release are even more serious. The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead

time. Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense. Imposing those consequences on anyone who has not yet been convicted is serious. It is especially unfortunate to impose them on those persons who are ultimately found to be innocent." 407 U. S. at 532-533.

Any presumed prejudice of this variety absolutely evaporates upon examination of the record in this case. The appellee spent less than ten days in the custody of the State of Maryland. He was arrested, after having been shot, at approximately midnight on May 26, 1971. In the early morning hours of May 27, he was transported by State Police helicopter to the Baltimore City Hospital. He was released from the Baltimore City Hospital and sent to the Maryland State Penitentiary on June 1, 1971. On June 6, 1971, he posted a $20,000 bail bond and was released. His total period of incarceration, at the hands of Maryland, constituted less than ten days. After undergoing surgery on June 7, 1971, for the removal of a .38 caliber bullet, the appellee returned to his home in Boston, Massachusetts, on June 9, 1971. As will be discussed more fully in dealing with the reason for the delay in this case, the appellee was from August 5, 1971, through the day of the hearing in this case — July 22, 1975 — continuously in the custody of either the Commonwealth of Massachusetts or the United States of America or both. Except for the ten days immediately following his arrest — a time period patently not "oppressive" — the appellee suffered no incarceration at the hands of the State of Maryland.

### b. *Prejudice to the Person by Way of Anxiety and Concern*

*Barker v. Wingo* described the possible impact in terms of anxiety and concern which might be inflicted upon a defendant by virtue of undue delay in bringing him to trial:

"[E]ven if an accused is not incarcerated prior to

trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility." 407 U. S. at 533.

By way of amplifying that discussion, *Barker v. Wingo*, at 407 U. S. 532, n. 33, cited *Klopfer v. North Carolina*, 386 U. S. 213, 221-222, 87 S. Ct. 988, 18 L.Ed.2d 1, 6-7 (1967), for the proposition that:

"[A] defendant awaiting trial on bond might be subjected to public scorn, deprived of employment, and chilled in the exercise of his right to speak for, associate with, and participate in unpopular political causes."

*Moore v. Arizona*, 414 U. S. 25, 27, 94 S. Ct. 188, 38 L.Ed.2d 183, 186 (1973), discusses this same aspect of possible prejudice by quoting with approval from the concurring opinion of Justice White in *Barker v. Wingo*:

"[Inordinate delay] . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends."

In aggregate, the cases are telling us that a defendant, subjected to undue pretrial delay, may suffer prejudice even when he is released on bond or personal recognizance. The classic instance was *Klopfer* where a Duke University zoology professor charged with the violation of a local ordinance when he demonstrated for civil rights, was kept under the cloud of pending charges, notwithstanding his demand to have them expeditiously resolved, for an indefinite period. He successfully maintained that the pendency of charges "greatly interfered with his professional activities and with his travel here and abroad." 386 U. S. at 218.

We find no analogy between that sort of situation and the one at bar. While awaiting his trial in Maryland, the appellee here was convicted in Massachusetts and served a sentence for manslaughter. He was, furthermore, indicted

and twice tried in Massachusetts (both trials resulting in hung juries) for the murder of Albert DeSalvo, the notorious "Boston Strangler." He was, furthermore, tried for an offense in the Federal Court. He was, furthermore, awaiting trial in the Federal Court for yet another offense. He was, furthermore, still awaiting his third trial in Massachusetts for the murder of DeSalvo. The appellee is a man with widespread criminal experience.

Under the circumstances, it becomes clear that the pendency of the Maryland charges did not "disrupt his employment." The pendency of the Maryland charges did not "drain his financial resources." He was represented here by the Office of the Public Defender. The pendency of the Maryland charges did not restrain his liberty in any way, because he was under direct physical restraint at the hands of the Commonwealth of Massachusetts. There was no remote suggestion that there was in this picture any family or friends in whom the pendency of the Maryland charges created anxiety. There was no remote suggestion that the appellee was in any way "chilled in the exercise of his right to speak for, associate with, and participate in unpopular political causes."

In terms of the more speculative and undifferentiated impact of "living under a cloud of anxiety," the pendency of charges in Maryland was at most minimally cumulative and not central to the life of this appellee during this four-year period. With the charges of and trials for the murder of the "Boston Strangler" and the Massachusetts conviction and prison sentence for manslaughter occupying center stage, the biography of the appellee for the years 1971-1975 would ascribe to Maryland only a very peripheral role, with even that supporting role shared with, if not overshadowed by, the federal prosecutions at the hands of the Organized Crime Strike Force.

The very notion of "anxiety" because of the unresolved Maryland charges is belied by the actions of the appellee. On the one occasion when Maryland was able to obtain his brief appearance for arraignment, on July 14, 1972, the only

request voiced by the appellee was that he *not* be required to go to trial in the immediate future. As will be discussed more fully in considering the "demand-waiver" factor, the appellee thereafter steadfastly and adamantly fought every effort to bring him to trial in Maryland. He obtained a federal restraining order prohibiting his removal from Massachusetts. He, indeed, sued the State of Maryland, among others, for $100,000 in compensatory damages and an additional $100,000 in punitive damages because he was taken to Carroll County for the arraignment on July 14, 1972. His actions were the very antithesis of those of a man anxious to resolve pending charges against him and distraught because Maryland would not cooperate in seeking that resolution upon the merits.[13A]

### c. *Prejudice to the Defense*

*Barker v. Wingo* described as the most serious of the varieties of possible prejudice the impairment to the defense itself:

> "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown." 407 U. S. at 532.

The record in terms of the State's theory of the case and the possible defense theory is almost as full as if the case had gone to trial. In addition to many detailed memoranda,

---

**13A.** An additional subvariety of prejudice, not dealt with directly in *Barker v. Wingo*, might, of course, arise when trial is unduly delayed in one state even while a defendant is incarcerated in another jurisdiction. This would be the loss of the chance to serve two sentences from two jurisdictions concurrently.

there was a lengthy pretrial hearing on the constitutionality of extrajudicial identifications, in the course of which there was full testimony as to the happenings on the night of the crime. In addition, the full transcript of the trial of codefendant James Nevens, at the conclusion of which the jury returned verdicts of guilty, was included as a part of this record.

The appellee was caught *in flagrante delicto* as he was in the act of burglarizing the Carroll County home, located near Westminster, of Baltimore attorney H. Morton Rosen. The Maryland State Police had received advance warning, through a confidential informant, that the appellee would be flying in from Boston to meet with local accomplices and then to execute the burglary. Three or four days prior to the crime, the codefendant Nevens had flown to Boston. On the day of the crime, the appellee flew in from Boston, met with Nevens and together they went to the home of one Benjamin E. Masters. A State Police discreet surveillance had picked the appellee up as he was driving from the Baltimore-Washington International Airport. Two girls, Joan Harriet Kessler and Mary Pauline Masters, testified for the State that they accompanied both the appellee and Nevens to Carroll County for the purpose of breaking into the Rosen home. The foursome traveled to Westminster in two separate automobiles, both of which had been leased in the name of one Doni Crone. One of the automobiles was used by Nevens and the appellee to go to the crime scene. The other, occupied by the two girls, was kept as an available back-up vehicle on a restaurant parking lot somewhat less than a mile away.

Before leaving Baltimore, the appellee and Nevens assembled various tools, including wrenches, crowbars, pliers, cutting torches, acetylene tanks, oxygen tanks and gauges (appropriate equipment for opening a safe). When the appellee and Nevens drove up to the rural Rosen home at approximately 9:30 p.m., Lt. Frank Mazzone and four other members of the State Police were secretly waiting inside the home. They were stationed at different positions throughout the house. Several lights had been deliberately left burning.

One was pointed from the inside at a pair of French doors, through which entry was ultimately made. Mazzone was crouched inside where he could observe this doorway. The positioning of the light served two purposes:

(1) It shone fully on the face of the person entering and thereby helped to obscure the State policemen hiding behind the light source; and

(2) In the event of a shoot-out, it made a good target of the burglar and a bad target of the policemen.

The automobile parked beside the Rosen home and the appellee got out. Several of the State troopers observed the figure of one of these two men try one door, move across the outside of several windows, and then move to the French doors previously mentioned. There were several loud knocks, which were unanswered. Lt. Mazzone then heard a prying and scratching at the door for approximately one minute. There was then a loud bang and the door broke open. Lt. Mazzone made a positive identification of the appellee as the man coming through the door. The light shone full upon his face for approximately twenty seconds. The appellee, who had entered with gun drawn, moved into a hallway beyond Mazzone's view.

Stationed down the hallway which the appellee entered was Corporal Peter Edge. As the appellee approached on a collision course, Edge shouted out, "State police!" The appellee fired in the direction of the voice. The bullet entered the wall, at belt level, inches from Corporal Edge. Corporal Edge, also startled, prematurely triggered his shotgun before getting it turned toward the appellee. It splattered a side wall. The appellee bolted from the house. The State police immediately followed. The car was abandoned at the crime scene. Nevens fled across the fields in one direction. The appellee fled in another. With only handheld searchlights to direct their fire, the State troopers directed a number of shots at the fleeing men but none made contact. There ensued for several hours a manhunt with helicopters and searchlights, as a large number of State troopers scoured a several square-mile area. The appellee was not found.

Meanwhile, several State troopers anticipated that he might make his way across the woods to the back-up vehicle which was parked on the lot of Baugher's Restaurant. They went there and removed the two girls from the car and stationed two troopers, slouched down, inside. At approximately midnight, over two hours after the aborted burglary, one of the troopers observed the appellee approaching the car. The trooper got out of the vehicle. When he observed the appellee make a move toward his hip, the trooper fired. The appellee collapsed on the pavement of the parking lot, with a bullet in the stomach. He was identified by Lt. Mazzone minutes thereafter and was then flown to the Baltimore City Hospital by State helicopter.

The defense theory is "strained to a filament." [14] The appellee claims that two key witnesses have died during the pendency of trial. One was Doni Crone. It is to be noted, however, that she died in August of 1971, within less than three months of the crime itself. Even under the most expeditious of circumstances, she would not have been available to the appellee and he cannot attribute her loss to an inordinate trial delay. [15] The second witness was John Robeshard, who allegedly heard a conversation between the appellee and Doni Crone. John Robeshard died in October, 1973. The record established that on February 13, 1973, the appellee's trial date was set for the following May 8, five months before the untimely death of the witness. The formal request to make the appellee available was forwarded to the Massachusetts Correctional Institution as of April 2, 1973. When it became obvious that the trial date

---

14. Justice Cardozo in *Snyder v. Massachusetts*, 291 U. S. 97, 54 S. Ct. 330, 78 L. Ed. 674 (1934).

15. *Jones v. State*, 279 Md. 1, 17, 367 A. 2d 1, 11, is instructive in this regard:

"The record indicates that co-defendant Kevin Darby, one of the prospective witnesses, was killed in May of 1973, and that prior to that time he was incarcerated in a mental institution and was not expected to attend his own trial. Since we have indicated that, had Jones been brought to trial promptly after the end of his federal trial in July 1973, denial of his speedy trial right probably would not have occurred, Jones cannot rely on prejudice from Darby's death."

could not be met, for the sole reason that the appellee was unavailable, the court and counsel on May 1, 1973, reset the appellee's trial for July 10, 1973, still three months before the untimely death of the witness. The July 10 trial date could not be kept because, notwithstanding Maryland's efforts to obtain the presence of the appellee under the terms of the Uniform Detainer Act, the appellee himself had brought a civil action in the United States District Court for the District of Massachusetts to restrain all parties from removing the appellee from Massachusetts to Maryland. As early as June 21, 1973, the appellee had been denied this restraining order at the District Court level but on June 22, 1973, he was granted a stay pending appeal. But for his own vigorous efforts to abort the July 10, 1973, trial date, the appellee would have had John Robeshard available as a witness.

In the light of the massive case against the appellee the theory of defense ostensibly supported by the dead witnesses, Doni Crone and John Robeshard, is a legal grasping at insubstantial straws. The appellee apparently wished to urge upon the court the notion that when he broke into the Rosen home, he was not committing burglary. There are allusions to the fact that Rosen was somehow holding some art work and/or antiques for Doni Crone, who was in some fashion dissatisfied with whatever it was that Rosen was supposed to be doing. Doni Crone ostensibly employed the appellee in some unspecified capacity, to replevy her goods. We know of no theory that would make such testimony legally material in the factual context of this case. If such surreptitious entry in the middle of the night — with crowbars, acetylene torches, etc. — were conceivably material as a defense to the burglary charge, it could not by the farthest stretch of the imagination justify opening fire upon the State police (or any other occupants) therein.

The analysis of the prejudice factor began with a presumption arising from the very length of the delay itself. Rather than rest upon the presumption, both sides introduced significant evidence bearing upon this factor. Emerging from the examination of that evidence is, at most,

a strained and speculative possibility of prejudice with essentially minimal values. We turn again to *Barker v. Wingo* for constitutional guidance. There, an even longer delay triggered the presumption of prejudice:

> "It is clear that *the length of delay* between arrest and trial — well over five years — *was extraordinary*. Only seven months of that period can be attributed to a strong excuse, the illness of the ex-sheriff who was in charge of the investigation." 407 U. S. at 533-534. (Emphasis supplied)

Whereas in this case, the appellee was incarcerated for ten days at the hands of the State of Maryland, in that case, Barker "did spend 10 months in jail before trial" at the hands of the Commonwealth of Kentucky. In that case, unlike this one, the Kentucky charges were the only ones hanging over the head of Barker. The Supreme Court acknowledged that, "Barker was prejudiced to some extent by living for over four years under a cloud of suspicion and anxiety." In the last analysis and notwithstanding the presumption of prejudice with which the analysis began, the Supreme Court concluded "that prejudice was minimal" and that there was an "absence of serious prejudice." 407 U. S. at 534. We find there was even less prejudice in the case now before us.

### The "Demand-Waiver" Factor

As we move beyond the prejudice factor, the tilt of the balance scales shifts even more dramatically against the appellee's claim. In *Barker v. Wingo,* the Supreme Court rejected the rigidity of the old "demand doctrine," whereunder a defendant who had failed to seek a speedy trial was forever barred, as a matter of law, from asserting a denial of his constitutional right to a speedy trial. The Supreme Court reaffirmed, however, that to make or to fail to make such a demand would be a significant factor in the overall analysis, as would "the frequency and force of the

objections" to efforts by the state further to continue a case. The Supreme Court pointed out:

"We reject, therefore, the rule that a defendant who fails to demand a speedy trial forever waives his right. This does not mean, however, that the defendant has no responsibility to assert his right. We think the better rule is that the defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right. Such a formulation avoids the rigidities of the demand-waiver rule and the resulting possible unfairness in its application. It allows the trial court to exercise a judicial discretion based on the circumstances, including due consideration of any applicable formal procedural rule. It would permit, for example, a court to attach a different weight to a situation in which the defendant knowingly fails to object from a situation in which his attorney acquiesces in long delay without adequately informing his client, or from a situation in which no counsel is appointed. It would also allow a court to weigh the frequency and force of the objections as opposed to attaching significant weight to a purely pro forma objection." 407 U. S. at 528-529.

Once again, the contrast between *Barker v. Wingo* and the case at bar is enlightening. In *Barker v. Wingo*, the Commonwealth of Kentucky, which had exclusive control over Barker throughout the over-five-year period, was the moving party in all of the continuances. Its sole purpose for seeking the continuances was to build a stronger case against Barker by trying a codefendant, Silas Manning, first and then using Manning against Barker at a time when Manning could no longer claim the privilege against compelled self-incrimination. The Commonwealth sought and obtained a total of sixteen continuances of Barker's trial, while Manning himself went through six trials. The Supreme Court found significant the fact that during the

three and one-half year period from July, 1958, to February, 1962, "Barker made no objection, through his counsel, to the first 11 continuances." 407 U. S. at 517. We contrast that mere silence in *Barker v. Wingo* with the explicit statements made by the appellee here, at the time of his arraignment on July 14, 1972, that he did not wish to come to trial "right away":

> "COURT: Which of these, when is the Federal trial to be had and will that be in Baltimore?
>
> MR. WILSON: It will be in Baltimore. I think, your Honor, we meet now, on the 26th, to meet with all the attorneys about a trial date. . . .
>
> COURT: In the event we cannot get an attorney appointed at this time to handle this case, would you have any objection to having his conference with you postponed until you come back here for your Federal trial?
>
> MR. WILSON: No objection whatsoever, your Honor, *as long as I don't go to trial, your Honor, for this right away.*
>
> COURT: Right. Oh, I understand. No, you'll have sufficient time but what I, I don't think we have any funds to send attorney's travelling around.
>
> MR. WILSON: I don't expect that.
>
> COURT: Well if that's satisfactory that's what we'll do. I'll get in touch with the Public Defender's Office and tell him what the problem is and see what we can get. If we can't get anybody today, which I doubt, we'll have to wait until you come back to Maryland the next time. You have no objection.
>
> MR. WILSON: No objection whatsoever, your Honor." (Emphasis supplied)

In *Barker v. Wingo*, when the Commonwealth of Kentucky sought its twelfth continuance on February 12, 1962, Barker responded by filing a motion to dismiss the indictment for lack of a speedy trial. The motion was denied and the twelfth continuance was granted. Upon the

occasions of the thirteenth and fourteenth continuances four months and seven months later, respectively, "Barker did not object." 407 U. S. at 517. On the occasion of the fifteenth and sixteenth continuances, an additional six months and nine months later, respectively, "Barker objected unsuccessfully." 407 U. S. at 518.

As in *Barker v. Wingo,* the first action with respect to a speedy trial by the appellee here was his motion to dismiss the indictments because of an alleged denial of his right to a speedy trial, which motion was filed on May 10, 1973. In pointing out that the first action of Barker was a similar action, the Supreme Court sounded heavily the *leitmotif* with which this opinion began — the gaping dissimilarity between demanding a speedy trial and demanding the dismissal of indictments for the lack of a speedy trial which never had been demanded:

> "Despite the fact that counsel had notice of the motions for continuances, the record shows no action whatever taken between October 21, 1958, and February 12, 1962, that could be construed as the assertion of the speedy trial right. On the latter date, in response to another motion for continuance, Barker moved to dismiss the indictment. The record does not show on what ground this motion was based, although *it is clear that no alternative motion was made for an immediate trial.* Instead the record strongly suggests that *while he hoped to take advantage of the delay in which he had acquiesced,* and thereby obtain a dismissal of the charges, *he definitely did not want to be tried."* 407 U. S. at 534-535. (Emphasis supplied)

As of July 14, 1972, the appellee was affirmatively requesting that he not be brought to trial "right away." [16]

---

[16]. The mendacity of the appellee is transparent when we contrast his words at the arraignment of July 14, 1972, with his characterization of that arraignment made in his motion to dismiss of May 10, 1973:

The appellee waived any objection that he might have had to any arguable delay prior to July 14, 1972. Significantly, this included the only possible period of non-diligence on the part of the State, the eight-month delay between the arrest on May 26, 1971, and the indictment by the Grand Jury of Carroll County on January 24, 1972.[17]

Moving beyond July 14, 1972, the appellee's attitude toward coming to trial in Maryland is indicated not by mere acquiescence in the delay, as in *Barker v. Wingo*, but by positive steps to avoid any return to Maryland for trial. The appellee was a prisoner serving a sentence in the Massachusetts Correctional Institution in Walpole, Massachusetts. The law provides an avenue for persons so situated in one jurisdiction to obtain a resolution of outstanding charges against them in another jurisdiction. That remedy is the Interstate Agreement on Detainers,

| Arraignment of July 14, 1972 | Characterization of that Arraignment |
|---|---|
| "COURT: . . . [W]ould you have any objection to having his conference with you postponed until you come back here for your Federal trial?<br>MR. WILSON: No objection whatsoever, your Honor, *as long as I don't go to trial, your Honor, for this right away.*<br>. . . .<br>COURT: Well if that's satisfactory that's what we'll do. I'll get in touch with the Public Defender's Office and tell him what the problem is and see what we can get. If we can't get anybody today, which I doubt, we'll have to wait until you come back to Maryland the next time. You have no objection.<br>MR. WILSON: No objection whatsoever, your Honor."<br>(Emphasis supplied) | "The State of Maryland waived jurisdiction and denied the defendant a speedy trial when he was before the Honorable Court on July 14, 1972.<br>The Petitioner was removed to State of Maryland and thereafter taken before the Carroll County Circuit Court on July 14, 1972, and *Petitioner was ready for trial,* and thereupon the Circuit Court for the State of Maryland waived all jurisdiction by releasing Petitioner out of their custody and permitting Petitioner to be moved to Massachusetts *when he was prepared for trial.*"<br>(Emphasis supplied) |

17. The immateriality of that "delay" will be discussed in analyzing the "reason" factor *infra*.

codified in our law as Art. 27, §§ 616A-616S. The statutory provisions are more specific than the general claim under the Sixth Amendment, but the availability of the statutory remedy influences the general Sixth Amendment claim. Under the Interstate Act, the burden is upon the prisoner to request the benefits of the Interstate Agreement on Detainers.

In the case at bar, the appellee never made a request under the Interstate Agreement on Detainers nor did he ever make a more informal request for a speedy trial generally. In terms of formal notice of the detainer which Maryland had lodged against him, both the Warden of the Walpole State Prison and the appellee himself received such notice on June 5, 1973. The appellee had actual notice much earlier. He signed a Recognizance on June 4, 1971, releasing him on a $20,000 bond on one charge of burglary and one charge of assault with intent to murder. The appellee discussed his pending Maryland charges in a letter to Russell J. White, Esq., a Maryland attorney who had represented him on federal charges. That letter was dated February 15, 1972. During the late winter and spring of 1972, regular correspondence was exchanged between the Circuit Court for Carroll County and the appellee in the Walpole State Prison. Immediately prior to his arraignment on July 14, 1972, the appellee discussed the charges against him with a member of the Carroll County Public Defender's Office. He was formally arraigned on July 14, 1972, and received a copy of the indictment. He received notices well in advance of the scheduled trial dates of May 8, 1973, and July 10, 1973. In short, he cannot claim ignorance of the pendency of the Maryland charges.

Shortly after receiving word of his scheduled trial date of July 10, 1973, the appellee filed his civil suit in the Federal District Court in Massachusetts seeking to restrain the Commonwealth of Massachusetts, the State of Maryland and the federal authorities from removing him out of Massachusetts in order to go to trial either in the State of Maryland or in the Federal Court for the District of

Maryland. Following a series of stays, the restraining order was not finally dissolved until the end of April, 1975.

Not once did the appellee seek to bring this case to trial. Not once did the appellee object to any trial delay, for indeed there were no delays occasioned by other than his own absence from the trial table. On the one occasion when the appellee was before the Circuit Court for Carroll County, his only request was that his case *not* come to trial "right away." The appellee positively and effectively thwarted any effort made by Maryland to bring him here for trial. Under these circumstances, the words of *Barker v. Wingo* in a far less extreme situation are pertinent and controlling:

> "The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." 407 U. S. at 531-532.

### Reason for Delay

Shorn of all elaboration, the simple and pervasive reason why this appellee did not come to trial for four years, one month and twenty-six days is that HE WAS IN JAIL IN MASSACHUSETTS. Details will follow, but that is the single, stark truth to which all discussion returns. He was arrested at approximately midnight on May 26, 1971. As of June 6, ten days later, he was released on bail. On June 9, he returned to his home in Boston. From that point on, the circumstances were beyond the control of this sovereignty. On August 5, 1971, the appellee was arrested by Massachusetts police for allegedly being an accessory after the fact to the crime of manslaughter. He was confined to the Billerica County Jail under $100,000 bail which he could not post. He remained in that jail through January, 1972, when he was found guilty on the manslaughter charge and sentenced to a term of six and one-half to seven years at the

Walpole State Prison, to which he was immediately transferred.

On several occasions, federal authorities from Maryland were able to obtain temporary custody of the appellee. During November, 1971, he was brought to Maryland and arraigned on charges of conspiracy and interstate transportation of stolen traveler's checks. A federal detainer was placed against him and he was returned to Massachusetts. In April, 1972, the appellee was again brought to the Federal District Court in Baltimore where he stood trial on the charges of conspiracy and interstate transportation and was found not guilty. He was returned to the Walpole State Prison in Massachusetts. On neither occasion did the State of Maryland have any contact with him.

On July 12, 1972, the appellee was again brought to the United States District Court in Baltimore to be arraigned on a new federal indictment, charging interstate transportation of stolen jewelry. It was during this trip to the Federal District Court of Maryland that Maryland State troopers took custody of the appellee for a few hours to bring him to Westminster for his arraignment of July 14, 1972.[18] These few hours on July 14, 1972, represent the only occasion between August 5, 1971, and July 22, 1975, when the appellee was in the physical hands of the State of Maryland.[19]

---

18. The mendacity of the appellee is further indicated by his apparent argument before the United States Court of Appeals for the First Circuit that he objected to having been brought to Westminster for arraignment purposes. The full reading of every word at that arraignment reveals not one note of protest as to the means by which he had been brought there. In referring to the subject, however, the United States Court of Appeals noted in its per curiam opinion of July 18, 1973, "His protests that there was no authority for the State of Maryland to take him were apparently overruled by the State trial court."

19. We are not unmindful of *United States v. Mauro*, 414 F. Supp. 358 (E.D.N.Y. 1976), but do not find it controlling. That case may have pertinence to the official exchange of the prisoner from the Commonwealth of Massachusetts to the United States District Court for the District of Maryland, although we note that the federal government brought the prisoner from Massachusetts, pursuant to a writ of habeas corpus ad prosequendum, in July, 1972, for the express and limited purpose of arraignment, whereas in the *Mauro* case, the prisoner was sent from the

In response to this arraignment in Maryland, the appellee, following his return to the Walpole State Prison, filed a civil action in the United States District Court for the District of Massachusetts on October 31, 1972. He sought a restraining order forbidding authorities from all three sovereignties to remove him from Massachusetts to either the State of Maryland or the United States District Court. He claimed $100,000 in compensatory damages and $100,000 in punitive damages for his allegedly unlawful removals from Massachusetts for arraignment in the Maryland court and in the Federal District Court in Baltimore. On December 11, 1973, Federal District Judge S. J. Wyzanski denied the appellee's motion. The appellee appealed to the United States Court of Appeals for the First Circuit. Pending the decision on that appeal, he obtained a restraining order from Federal Judge Tauro forbidding his removal from the State of Massachusetts. That order and its successors remained in effect until dissolved on April 28, 1975. It was the order of June 26, 1973, specifically, which precluded the appellee's scheduled trial in Westminster on July 10, 1973.

As of December 17, 1973, there was yet a second circumstance totally beyond the power of Maryland to control which made it impossible to try the appellee for his Maryland crimes. On that day, the appellee was indicted by the Grand Jury for Norfolk County in Massachusetts for conspiracy to murder Albert DeSalvo, the "Boston Strangler."

The Governor of Massachusetts, Francis W. Sargents, ordered the Massachusetts prison authorities not to release

State of New York to the United States District Court for purposes of trial. In any event, the appellee here was never officially transferred from the Commonwealth of Massachusetts to the State of Maryland pursuant to either the Interstate Detainer Act or a writ of habeas corpus ad prosequendum. Whatever effect the *Mauro* decision may have had, it would have been upon the then pending (and now disposed of) charges in the federal court and not upon those pending in the State of Maryland. Maryland did not obtain the presence of the appellee by any legal process or request filed with the Commonwealth of Massachusetts and Maryland had no lawful authority to retain the appellee in its control. Indeed, even if Maryland unlawfully "borrowed" the appellee from his federal custodians on July 14, 1972, that fact would not defeat Maryland's right to try him. *Frisbie v. Collins*, 342 U. S. 519. 72 S. Ct. 509, 96 L. Ed. 541 (1952).

the appellee to anyone until the charges involved in the "Boston Strangler" case had been resolved. This case went to trial in Massachusetts from September 9 to October 1, 1974, and ended in a mistrial because of a hung jury. It went to trial again from February 10 to March 5, 1975, and again ended in a mistrial because of a hung jury. As of April, 1975, the appellee had finished serving his first sentence in Walpole and the Commonwealth of Massachusetts, although still intending to try him yet a third time for the DeSalvo murder, indicated it was willing to let him go to trial on the federal charges and on the Maryland charges first. On April 14, 1975, there was filed a Motion to Dissolve Temporary Restraining Order. That motion was granted on April 28, 1975.

In the meantime, what was happening in Maryland was literally beside the point. The Carroll County State's Attorney's Office certainly did not move with any commendable dispatch in delaying the appellee's indictment until January, 1972. Whatever fault may have inhered therein, however, was fault in a vacuum. It was not remotely the proximate cause of the delay in this case, which was directly attributable to the appellee's difficulties with the State of Massachusetts commencing on August 5, 1971. In October, 1972, Charles O. Fisher, Jr., was appointed as a special prosecutor and from that point forward, Maryland was the soul of diligence in making every effort to move the case forward. It was thwarted through events which were exclusively chargeable to:

(1) His arrest, trial and sentence in Massachusetts for accessoryship after the fact of manslaughter; (2) His indictment and trials for conspiracy to murder Albert DeSalvo; and (3) His own affirmative efforts in the United States District Court for Massachusetts to prevent his return to Maryland.

With respect to the allocation of fault for Sixth Amendment purposes when a defendant is imprisoned in another sovereignty, Judge Carter said for this Court in *Davidson v. State*, 18 Md. App. 61, 70, 305 A. 2d 474, 481:

"From our independent review of the record, we

find that the portion of the delay period that was represented by the time the appellant was imprisoned in Delaware (16 months) was not caused by nor attributable to the State of Maryland."

In the case at bar, the appellee was not simply in prison in another sovereignty but two of those sovereignties took affirmative steps to prevent his return to Maryland. In this regard, the words of Chief Judge Gilbert in *Isaacs v. State*, 31 Md. App. 604, 613, 358 A. 2d 273, 279, are very pertinent:

"... Maryland is unable to proceed where, as here, the matter is delayed by the unwillingness of the State having custody of the prisoner to relinquish, even temporarily, that custody."

Indeed, in the *Isaacs* case, Chief Judge Gilbert indicated that in a case such as this, the "speedy trial" gears would only become engaged following full compliance with the Interstate Detainer Act. He pointed out, at 31 Md. App. 614, 358 A. 2d 279:

"The appellant went to trial on September 15, 1975, a period of five months and six days subsequent to compliance with the Act. Such a delay, under the circumstances, in our view, is not of constitutional dimension and neither *Barker* nor *Hunter* dictate a reversal under the facts of this case."

And see *Hoss v. State*, 13 Md. App. 404, 413, 283 A. 2d 629, 634, reversed on other grounds, 266 Md. 136, 292 A. 2d 48.

In allocating fault where there is imprisonment in another state, this Court in *Isaacs* could not have been more emphatic, saying at 31 Md. App. 614, 358 A. 2d 279:

"The appellant, however, was dehors the jurisdiction of the State of Maryland. This State's jurisdiction over him was not gained until he and the custodial State had complied with the Interstate Detainer Act, thereby waiving extra-

dition and consenting '... to the production of his body ...' in the Circuit Court for Allegany County. Md. Ann. Code art. 27 § 616D (e). Manifestly, appellant cannot avail himself of *Barker* and its progeny, when it is he, by his criminal acts in another State, or his wilful absence from Maryland, which prevented this State from proceeding with the trial. Under the rationale of *Davidson, supra,* the appellant is chargeable with any delay in the trial, accounting from October 3, 1973, the date of indictment, running to April 9, 1975, the date when there was compliance with the Interstate Detainer Act."

Manifestly, the reason for delay in this case — the fault — is attributable to the appellee. The words of *Barker v. Wingo* are apposite:

"We hardly need add that if delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine, the demand rule aside." 407 U. S. at 529.[20]

### Conclusion

Under the four-factor analysis, we have (1) a very long period of delay; (2) presumptive prejudice, which largely evaporates under closer analysis; (3) an absolute failure to demand a speedy trial coupled with affirmative acts of waiver; and (4) fault attributable solely to the appellee. Returning for one last time to *Barker v. Wingo,* we note that

---

**20.** On several occasions, the Supreme Court has pointed out that incarceration in another state has a bearing even on the prejudice factor. They said in *Moore v. Arizona,* 414 U. S. 25, 27, 94 S. Ct. 188, 38 L.Ed.2d 183, 186 (1973):

"Some of these factors may carry quite different weight where a defendant is incarcerated after conviction in another State ..."

They also noted in *Strunk v. United States,* 412 U. S. 434, 439, 93 S. Ct. 2260, 37 L.Ed.2d 56, 61 (1973):

"We recognize, as the Court did in *Smith v. Hooey,* that the stress from a delayed trial may be less on a prisoner already confined, whose family ties and employment have been interrupted ..."

the Supreme Court, under circumstances infinitely less foreclosing of the speedy trial claim than those in this case, concluded:

"[B]arring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, that the defendant did not want a speedy trial." 407 U. S. at 536.

The appellee's right to a speedy trial was not denied. The motion to dismiss the indictments should not have been granted.

> *Order dismissing indictments vacated; case remanded for trial; costs to be paid by appellee.*